**UNITED STATES of America ex rel. Caswell LATHAN, Jr., Petitioner-Appellant,**

**v.**

**John DEEGAN, Superintendent of Auburn Correctional Facility, Auburn, New York, Respondent-Appellee.**

**No. 211, Docket 71-1547.**

United States Court of Appeals, Second Circuit.

Argued Oct. 14, 1971.

Decided Nov. 1, 1971.

John F. Lang, New York City (Allan J. Berdon, New York City, of counsel), for appellant.

Brenda Soloff, Asst. Atty. Gen. of N. Y. (Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for appellee.

Before FRIENDLY, Chief Judge, CLARK, Associate Justice,* and KAUFMAN, Circuit Judge.

IRVING R. KAUFMAN, Circuit Judge:

After more than twelve years of legal maneuvering, Caswell Lathan, Jr. asks this court to reverse the denial of his petition for a writ of *habeas corpus* based on allegedly involuntary admissions used against him at trial.

Lathan was charged with first degree murder for the July 23, 1959, slaying of Gertrude Stransky. He was tried and convicted in the Bronx County Court before Judge Schulz and a jury.[1] Although this conviction was sustained on direct appeal to the Appellate Division and the New York Court of Appeals, People v. Lathan, 15 A.D.2d 906 (1st Dept.), aff'd. 12 N.Y.2d 822, 236 N.Y.S.2d 345, 187 N.E.2d 359 (1962), remittitur amended, 13 N.Y.2d 670, 241 N.Y.S.2d 164, 191 N.E.2d 668 (1963), the Supreme Court of the United States remanded the case to the New York Court of Appeals for further proceedings consistent with this opinion in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Lathan v. New York, 378 U.S. 566, 84 S.Ct. 1923, 12 L.Ed.2d 1038 (1964). *Jackson* declared unconstitutional the New York procedure which required defendants to challenge the voluntariness of confessions before the trial jury.[2]

In accordance with an order of the New York Court of Appeals, the Bronx County Supreme Court held a Huntley hearing to determine the voluntariness of the confession. People v. Lathan, 15 N.Y.2d 723, 256 N.Y.S.2d 935, 205 N.E. 2d 200 (1965).[3] Justice Spector, who presided over the hearing, heard testimony from Lathan and thirteen witnesses for the State. The hearing was anything but perfunctory and a lengthy opinion was filed more than a month after the hearing commenced. Justice Spector, after making detailed findings of fact, concluded that Lathan's confession was voluntary and thus properly admitted at this trial. This order was affirmed by the Appellate Division, People v. Lathan, 30 A.D.2d 1053, 294 N.Y.S.2d 676 (1st Dept.1968), the Court of Appeals denied leave to appeal and the United States Supreme Court denied certiorari, Lathan v. New York, 397 U.S. 941, 90 S.Ct. 954, 25 L.Ed.2d 122 (1970). Having thus exhausted his state court remedies, Lathan sought *habeas corpus* relief pursuant to 28 U.S.C. § 2254 in the District Court for the Southern District of New York. Judge Palmieri denied the petition without a hearing, concluding on the basis of the facts found after the full state Huntley

---

* United States Supreme Court, retired, sitting by designation.

1. Lathan was sentenced to life imprisonment on June 24, 1960, after a jury recommendation of mercy.

2. The New York procedure required the court to exclude a confession only if it determined that under no circumstances could it be deemed voluntary. If a "fair question" of voluntariness was presented, the trial jury would hear the evidence and decide the question of voluntariness itself. The Supreme Court found this procedure defective because, *inter alia*, a jury might find it difficult to exclude from consideration a confession appearing to be true, regardless of its voluntariness. Jackson, 378 U.S. at 381, 84 S.Ct. 1774.

3. This hearing was held in conformity with the procedure dictated in People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

hearing that the confession was voluntary as a matter of federal constitutional law.[4]

■ We affirm the order denying the petition for *habeas corpus* relief.[5]

## I.

A brief statement of the alleged crime and the confession elicited are necessary to an understanding and disposition of Lathan's claims. Gertrude Stransky was killed in her Bronx apartment on July 23, 1959, by repeated stabbings. In addition, two rings, other jewelry and some cash belonging to her were stolen. The police uncovered fingerprints in the apartment, and a knife, the suspected murder weapon, was found in an automobile parked nearby.

Lathan, eighteen years old and on furlough from the Army at the time, was apprehended while burglarizing a Yonkers apartment and was taken to a Yonkers police precinct on August 9. After a short interrogation, Lathan signed a confession to the Yonkers burglary charge.[6] He was arraigned without counsel on August 10 and transferred to the Westchester County Jail.

On August 11 two military police, aware only of Lathan's Yonkers burglary arrest, visited him to ascertain his military status. They testified at the Huntley hearing and Justice Spector found, contrary to Lathan's claim, that they did not promise Lathan that the military would provide assistance.

Meanwhile, the Stransky investigation zeroed in on Lathan. In an hour long session with four detectives, also on August 11, Lathan denied any knowledge of the Stransky homicide. He insisted also that he had not been in the area of the Bronx apartment house on July 23.

The man who was to prove to be Lathan's chief antagonist, Detective Tobias Stegman of the New York City Police Department, visited Lathan the next day. Instead of disclosing his identity, however, Stegman, dressed in civilian clothes, introduced himself as a lieutenant-colonel in the army and showed Lathan his Army identification card. Close scrutiny of the card would have disclosed that Stegman was a member of the Army Reserves. Stegman spoke with Lathan of his Army experiences and stated "the Army and I want to help you."

The coincidental visit of the military police may have helped create the illusion in Lathan's mind that the Army was trying to help him. In any event, Lathan began talking about his adventures since leaving his Army post, including a walk to the Bronx on the night of July 23. Lathan revealed that he ascended to the roof of a building to which he had once delivered newspapers and admitted entering an apartment through a window.[7] Stegman then stated to Lathan that he knew that a homicide had taken place in that apartment and that Lathan's fingerprints had been found there. Lathan refused to go beyond his admission that he had entered the apartment in question. After conferring with his associates who had remained outside the interrogation room, Stegman

4. Judge Palmieri also denied Lathan's request for a certificate of probable cause, but on June 3, 1971, this court granted Lathan's motions for a certificate of probable cause, leave to proceed in *forma pauperis* and assignment of counsel.

5. Since Lathan makes no claim that the state hearing was less than full and fair, we presume the state factual findings to be correct. 28 U.S.C. § 2254(d) provides in relevant part:
   * * * a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct.
   * * *

6. At no time between the arrest of Lathan on the burglary charge and his confession to the murder charge four days later was Lathan advised that he had a right to remain silent and that any statements he made could be used against him.

7. The apartment Lathan entered was that of Mrs. Stransky, but Lathan did not admit it at this time.

unsuccessfully questioned Lathan again. The total time involved in these sessions was less than two hours.

Stegman returned to question Lathan the following day in the Westchester County District Attorney's Office. After an initial fruitless interrogation, Stegman met with his associates and then returned and confronted Lathan with the murder weapon and a photograph of the victim. Lathan remained firm in his denial that he killed Mrs. Stransky. At this point, Assistant District Attorney Farrell and Chief of Detectives Walsh, entered the room. Walsh now made an unsuccessful attempt to secure a confession from Lathan, while Stegman maintained his silence. Walsh and Farrell left after approximately ten minutes, and Lathan was again alone with Stegman. Becoming fully aware that the evidence against him was overwhelming and that his further denials would accomplish nothing, Lathan launched into his detailed confession.[8] At the Huntley hearing, Lathan contended for the first time that he was motivated to confess only after a promise by Stegman that Lathan would be placed in a mental hospital if he admitted committing the homicide. No mention of this alleged promise was made by Lathan when he testified at his original trial, and Stegman's denial constitutes additional evidence supporting Justice Spector's finding that Lathan's testimony was fabricated.

With the "cat out of the bag," Lathan scarcely resisted when he was taken to a room in which Farrell, Walsh, Stegman, a stenographer and several other officers were present and repeated his confession. At this time it was Farrell who conducted the questioning, and Lathan's responses traced the same path as his previous statements to Stegman.

## II.

■■ Lathan contends that his admissions to Stegman and the question-and-answer confession given to Farrell were made involuntarily and their introduction rendered his trial constitutionally defective. Manifestly, if Lathan's statements were secured today without notifying him of his right to counsel and of his right to remain silent, they would be inadmissible. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). *Miranda,* however, has not been applied retroactively to invalidate confessions introduced at trials commencing prior to June 13, 1966. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Instead, these factors may be considered in the totality of circumstances surrounding the confession in determining its voluntariness. See Clewis v. Texas, 386 U.S. 707, 708–709, 87 S.Ct. 1338, 18 L. Ed.2d 423 (1967); Davis v. North Carolina, 384 U.S. 737, 740–741, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). Only when accompanied by other circumstances tending to indicate that the will of the defendant was overborne will the absence of counsel or the failure to advise of his fifth amendment right, render the confession involuntary and inadmissible in a pre-*Miranda* case. *See, e. g., Clewis, supra* (extremely low intelligence of defendant); Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336 10 L.Ed.2d 513 (1963) (prolonged incommunicado detention); United States ex rel. Everett v. Murphy, 329 F.2d 68 (2d Cir.), cert. denied, 377 U.S. 967, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964) (extensive questioning, false promise of police assistance). But none of these factors was found to be present in this case.[9]

■ Lathan presents several overlapping theories to support his contention

8. Lathan described how he entered a bedroom and saw a naked woman, told her to be quiet and she would not be hurt, punched her in the face to quiet her and stabbed her to death.

9. The length of incarceration here appears deceptive, since for two of the days Lath-

an was in custody there was no reference to the Stransky homicide. Moreover, no session lasted more than an hour and the total length of all the sessions was less than eight hours. Claims of physical deprivation made for the first time by Lathan at the Huntley hearing were rejected by Justice Spector.

that, since Stegman palmed himself off as an Army officer, the confession was rendered inadmissible. Lathan would have us read Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) as holding that any confession following police deception is involuntary. The holding in that case is not nearly so broad. In *Spano*, a rookie patrolman who was also a close friend of the defendant stated that his job in the Police Department and the welfare of his pregnant wife and three children would be in jeopardy if Spano did not confess. Moreover, Spano already had been indicted for the crime under investigation when he was denied access to his retained attorney and questioned continuously for eight hours by a battery of some fifteen interrogators. No such factors are presented here. Stegman's representations with respect to the Army were not of such a character as to overbear Lathan's will so that he was unable to resist pressure, nor was there the slightest indication that he was fatigued. Stegman merely set the scene —whether or not Lathan believed he was an army officer—[10] for Lathan to unburden himself. The confession was, in fact, induced by Stegman's demonstration that he had hard evidence linking Lathan to the homicide and not, as alleged, by Stegman's feigned friendliness. It is inconceivable that a person of reasonable intelligence would confess merely to please an acquaintance of one day, which in substance is Lathan's claim.[11] .

Nor do the circumstances under which Lathan's confession was secured come within the proscription of United States ex rel. Everett v. Murphy, *supra*. In *Everett* the relator was arrested illegally and detained incommunicado during extensive questioning. His confession followed an outright fabrication of a crucial fact by the interrogator. Although the victim already had died, Everett was advised that the victim was only slightly injured and that the police would help reduce the charges against him if Everett would cooperate by confessing.[12] A mere deception by an interrogator, *ipso facto*, does not invalidate a confession absent other compelling circumstances. In *Everett*, we focused on the promise of police assistance to reduce the charges as rendering the confession involuntary, stating that the "deception of Everett as to Finocchiaro's survival of the attack might be ignored if it stood alone." *Id.*, 329 F.2d at 70. *See also* United States ex rel. Caminito v. Murphy, 222 F.2d 698, 700–701 (2d Cir. 1955).

Another imperfect arrow in Lathan's quiver is his argument that Stegman may have violated criminal statutes when he posed as an officer in the United States Army and, therefore, that his confession was inadmissible.[13] But the short answer to this is that Stegman was a member of the Army Reserves and legitimately possessed his Army identification card. Thus, it is by no means apparent that Stegman's alleged conduct violated any of the cited statutes. Finally, assuming *arguendo* that Stegman did violate one of the statutes, it does not follow that the subsequent confession would be tainted and that

10. Judge Palmieri found that Lathan was not in fact deceived by Stegman. Judge Palmieri noted that at the trial Lathan admitted that he suspected Stegman was not an Army officer when Stegman questioned him about the homicide.

11. Lathan was not one who would be easily taken in. Justice Spector found him to be "keen, imaginative, sharp, elusive and very articulate * * *"

12. The confession eventually was used against Everett to secure a first degree murder conviction.

13. 18 U.S.C. § 912 provides:
Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined not more than $1,000 or imprisoned not more than three years, or both.
18 U.S.C. makes it a misdemeanor to possess an army identification card except as authorized by law.

such violation would have the consequences for which Lathan contends. It would not aid Lathan if we were to apply a per se exclusionary rule to fruits of the illegality as we do in cases of fourth amendment violations.[14] *See, e. g.* Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It is clear to us, as it was to Justice Spector and Judge Palmieri, that Lathan's confession was not a "fruit" of Stegman's alleged deception.

Other arguments urged by Lathan, which are premised on "facts" found at the Huntley to be untrue, need not concern us. *See* 28 U.S.C. § 2254(d).

The order of the District Court is affirmed.

---

14. Lathan guides us to Reed v. United States, 252 F. 21 (2d Cir. 1918), which upheld the convictions of persons prosecuted for masquerading as military officers for the purpose of arresting deserters for reward. But we find no indication in *Reed* that the arrests and subsequent courts-martial of those apprehended by the impersonators were affected.