COMMONWEALTH *vs.* JAMES B. DOYLE.

Essex. November 7, 1978. — January 23, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Constitutional Law*, Waiver of constitutional rights. *Waiver. Evidence*,
Relevancy and materiality, Expert opinion. *Practice, Criminal*,
Comment by judge, Capital Case.

Evidence that the defendant in a murder trial, although feeling the
effects of heavy drinking, was coherent, appeared to understand
what was said to him, and spoke understandably and in relevant
response to the questions put to him by the police warranted a
finding that the defendant validly waived his Miranda rights before
making statements to the police. [133-138]
At a murder trial, no error was shown in various rulings by the judge
on evidentiary matters nor in his remarks to defense counsel dur-
ing final argument. [138-140]

INDICTMENTS found and returned in the Superior Court
on May 23, 1977.

The cases were tried before *Lappin, J.*

*Albert S. Previte, Jr.*, for the defendant.

*George M. O'Connor*, Assistant District Attorney, for
the Commonwealth.

KAPLAN, J. The defendant James B. Doyle was convict-
ed of murder in the first degree and armed robbery in
connection with the death by stabbing of Harold Cotton
in a hotel in Lawrence in which these men and certain
principal witnesses were lodgers. Appealing pursuant to
G. L. c. 278, §§ 33A-33G, the defendant contends that the
trial judge committed error in refusing on voir dire to
grant his motion to suppress statements he made to the
police after Miranda warnings but at a time, as he claims,
when he was unable to make an intelligent waiver of
rights because he was intoxicated. The defendant also

complains of various rulings and remarks by the judge in the course of the trial. Finally, the defendant urges us, if the conviction of murder should be held without legal error, to mitigate the sentence under G. L. c. 278, § 33E.[1] We affirm the convictions and deny relief under § 33E.

1. First we describe what was brought out on the motion to suppress. Philip Barbieri, a bartender at the "Chez When," a striptease bar near the hotel, testified that sometime between 8 and 9 P.M. of January 25, 1977, the defendant appeared at the bar and began ordering "Southern Comfort" on the rocks (there was approximately one ounce of the liquor per drink). The witness served the defendant eight to ten such drinks in the course of the evening. One of the performers, Carol Darling, between dances on the stage, joined the defendant at his place at the bar and spoke with him. She said the defendant before closing (which is put at 12:40 A.M.) asked her for a lift to the hotel. Darling was met at closing by a friend with a car, and the defendant was accommodated. He was dropped at the hotel after 1 A.M.

Entering the lobby, the defendant saw a friend, Nicolina Davi, who, according to her testimony, had been trying to help the defendant with his drinking problem. As he came toward her she probably chided him for drinking— she had heard of his consuming that afternoon almost two quarts of "Sombrero" (a kind of coffee liqueur).[2] The defendant threw his arms about Davi and, weeping, murmured that he had killed somebody.

Davi said she drew the defendant into the laundry room on the same floor beyond a TV room, and had him

---

[1] The defendant was sentenced to concurrent life sentences at the Massachusetts Correctional Institution at Walpole.

[2] At the trial there was testimony by Hartung (see below in the text) that he and the defendant had begun to play chess in Hartung's room about 2 P.M. and during the next three and a half hours the defendant consumed most of two quarts of Sombrero but at the end vomited profusely. Darling mentioned at voir dire that the defendant told her about this drinking.

throw water on his face. In answer to her questions, he
said the man was Harold, he had killed him there at the
hotel. As Davi and the defendant passed back through the
TV room, the defendant bought three Cokes from a ma-
chine (one, he said, was for Davi's roommate Lenore), and
the pair walked up a stairway to reach the defendant's
room on the fifth floor. On their way they stopped at the
victim's room, number 406 on the fourth floor. They
heard sounds coming from a radio in the room. The de-
fendant tried the door, putting his hand in the pocket of
his jacket and grasping the door knob with his hand thus
covered.

They went on to the defendant's room. The defendant
lay down and Davi removed some of his clothes to help
him rest. He enlarged on his account of the killing. He
said he was going to see his girl friend and had Bobby
Hartung's knife in case of trouble.[3] He went to Harold's
room and stabbed Harold in the heart again and again
until Harold's tongue hung out. He took $37. Then he
went upstairs to his room and washed the knife in the
sink. Now, he said, he was sick mentally and physically
and wanted to call the police. Davi counselled him first
to call his social worker. She examined the sink and
found it clear of blood.

Davi went to Hartung's room and spoke with him.
Together they walked downstairs to the victim's room.
Hartung tried to open the door with a knife, then made
a small hole in the door panel. Peering into the room,
they saw the victim, evidently dead, lying half in, half out

---

[3] At the trial Hartung said the defendant had asked him during the
afternoon about the loan of a knife, had borrowed a knife about 7:30
P.M. and returned it around 8:30 P.M. The prosecution accepted the
testimony by one Robert Bergman that the defendant had appeared
at an apartment house in Methuen (a ten-minute ride, or less, by car
from the hotel) to visit his girl friend but she was not there. Bergman
placed his meeting with the defendant between 7 and 7:30 P.M. When
the defendant returned the knife to Hartung, however, he said (ac-
cording to Hartung) that he had not gone to see his girl friend.

of the bed, his shirt bloodied. They returned to the defendant's room and after a while they and the defendant went down the staircase into the lobby. Walking toward a phone booth, the defendant met Leo J. Cronin, the hotel manager, and asked him what he was doing there. This was the fourth time Cronin had seen him that day: other meetings, according to Cronin's testimony, occurred at 10 A.M., after lunch, and at 6 P.M.

The police were summoned sometime before 2 A.M.[4] About 2 A.M. Officers John F. Lundy and Anthony R. Lorenzo and Sergeant Joseph St. Germain arrived at the lobby. Lundy testified that he with others went to room 406 and viewed the body. Lundy left to get a camera. Lorenzo said he observed the defendant in the lobby coming out of a pay telephone booth and thought he saw blood stains on his shirt. Lorenzo asked the defendant to go to the TV room. There the defendant was confronted by Lorenzo and Lundy (returned from his brief trip).

Lundy testified that he told the defendant they were investigating the murder of Cotton and the defendant was a suspect. The defendant asked excitedly why he was being arrested. Lundy said they were not arresting him, but wanted to question him, and before doing so had to inform him of his rights. Lundy handed the defendant a card with Miranda warnings, which the defendant appeared to read. Lundy then read the warnings from the card, and asked whether the defendant understood. The defendant said he did, he had been through this before, and he signed the card, witnessed by Lundy and Lorenzo. There was a short conversation. In response to questions by Lundy, the defendant said he had visited Harold Cotton once, but not that night or morning. Then Lundy

---

[4] At the trial there was testimony by Camille G. Fredette, a lodger, that he had had a meal with the victim in room 406 which can be placed some minutes before 7 P.M. Fredette later became suspicious when he found the door of 406 locked, and rapped on the door without response. He awakened Cronin who opened the door of 406 and then called the police.

asked whether he had killed Harold. The defendant, throwing his arms out and crying, said yes, yes, the booze made him do it.

At this point Sergeant St. Germain, carrying a brown bag, came into the room.[5] Davi and Hartung were with him. On seeing St. Germain, the defendant rushed to him and clasped him, and crying Joe, Joe, he said the booze made him do it, he needed the money.

Taken to the police station, the defendant was booked and again given Miranda warnings. About 3:15 A.M. Lieutenant Joseph Fitzpatrick went to the defendant's cell to ask him to surrender his clothes for inspection. The defendant said, what for, he had told them he did it, he had told them all.

To focus more narrowly on the defendant's condition in the early morning of January 26: It was common ground that the defendant had done much drinking that day, but it also appeared, particularly from the testimony of Davi, that the defendant was an habitual drinker, which suggests, though it does not prove, that he had a more than normal tolerance of alcohol. So also it is clear that the defendant was feeling the effects of drinking, was looking dishevelled, distraught, and nervous, and at some moments was weeping or near tears. Darling and Davi described the defendant, at least at some points in their narratives, as staggering or not fully ambulatory, and "loaded." On the other hand, the police witnesses Lorenzo, Lundy, and St. Germain described the defendant as steady on his feet and near total sobriety. Barbieri saw the defendant as "feeling good" but not disabled. Cronin, who encountered the defendant at intervals during the day, believed him to be sober throughout. The judge made the point in his findings that the defendant remained coherent. See *Commonwealth* v. *Sires*, 370 Mass. 541, 544 (1976); *Commonwealth* v. *Roy*, 2 Mass. App. Ct. 14, 19

[5] From testimony at the trial, it appeared that St. Germain had in the bag the knife borrowed by the defendant and returned to Hartung.

(1974). The defendant appeared to understand what was said to him so that he did not ask for repetition, and spoke understandably and in relevant response to the questions put to him: he seemed to know what he was doing. The judge concluded that the defendant was not incapacitated by drink to a degree that would justify barring the introduction at trial of his statements to the police.

The conclusion is strengthened by the defendant's specific actions over a period of time: his asking a lift to the hotel, buying a Coke for Lenore, managing five flights of stairs both ways, having the wit to avoid fingerprints on the doorknob of room 406, forming a desire to call the police (tempered possibly by Davi's advice about the social worker), engaging the hotel manager in conversation as he came from his room into the lobby, making the telephone call, and referring to his previous experience with the Miranda procedure — actions all suggesting adequate intelligence at the critical moment. Nor was there anything overbearing in the officers' actual administration of the Miranda warnings (or in the episode at the cell).

The motion to suppress was addressed only to the statements given to the police, not to the statements made to Davi without official interposition. We do not suggest that any possible error in the admission of the former statements was necessarily rendered harmless in the face of the latter. It is, however, some indication that the waiver of Miranda rights was knowing and voluntary, that the defendant, shortly before, had, according to Davi, confessed the deed as if to relieve his mind of the burden, and, indeed, later himself suggested calling the police.

We do not find any sufficient basis for rejecting the judge's opinion with respect to effective waiver. The present case falls short of *Commonwealth* v. *Hosey*, 368 Mass. 571 (1975), a case of serious disablement through self-induced intoxication. See *United States* v. *Guaydacan*, 470 F.2d 1173 (9th Cir. 1972); *Gladden* v. *Unsworth*, 396 F.2d 373, 378 (9th Cir. 1968). It is rather attracted to those

cases where, despite drinking (or drug taking), there remained a capacity to understand and relinquish rights. See *Commonwealth* v. *Hooks*, 375 Mass. 284, 287-290 (1978); *Commonwealth* v. *Fielding*, 371 Mass. 97, 103-113 (1976); *Commonwealth* v. *Sires*, *supra* at 543-545; *Commonwealth* v. *Roy*, *supra* at 17-21; *United States ex rel. Hayward* v. *Johnson*, 508 F.2d 322, 324-328 (3d Cir.), cert. denied, 422 U.S. 1011 (1975).[6]

2. As to rulings and remarks by the judge during trial: (a) From Hartung (who testified at trial though not on voir dire) the defense elicited that he was behind in his rent at the hotel on January 25. He said he had no idea just what the arrears were. The judge excluded a question that began, "If I told you—," which was followed by an offer of proof that the witness would have answered that he was behind in his rent by $153.35. The defense was making a vague effort to suggest that Hartung had committed the crime to get money to pay his bill. To that end the precise amount owed was not crucial. See *Commonwealth* v. *Adrey*, 376 Mass. 747, 752-753 (1978); *Commonwealth* v. *Hoffer*, 375 Mass. 369, 374 (1978). The effort to entangle Hartung in the commission of the crime was not pursued further. Later allowed in evidence, however, was a list of residents at the hotel with conceivable opportunity to visit room 406.

---

[6] The record has been reviewed with attention to the propositions that there is a presumption against waiver of constitutional rights, and, with regard to the attitude owed by the reviewing court to the trial judge who rules on a motion to suppress, that it is for that judge to resolve questions of credibility; that his subsidiary findings are to be respected if supported by the evidence; that his findings of ultimate fact deriving from the subsidiary findings are open to reexamination by this court, as are his conclusions of law, but, even so, that his conclusion as to waiver is entitled to substantial deference. See *Commonwealth* v. *Tabor*, 376 Mass. 811, 822 (1978), and cases cited; *Commonwealth* v. *White*, 374 Mass. 132, 137-138 (1977), aff'd, 439 U.S. 280 (1978).

As indicated at point 3 below, the question whether the defendant's statements (testified to at trial as well as at voir dire) deserved consideration in view of the defendant's condition (also so testified to) was renewed and put to the jury by the judge's instructions.

(b) At 10 A.M. the defendant asked the hotel manager Cronin to let him into Davi's room (she was out of town at the time). The manager refused. The request was repeated at 6 P.M. when the manager encountered the defendant entering the elevator on the fifth floor. On the former occasion, and possibly also the latter, the defendant said he was "holding." Questioned about what he understood by "holding," Cronin said he was doubtful, but thought it might refer to money or a weapon, but not narcotics. The judge excluded, over objection, the further question whether any of the residents used narcotics. The point of the line of questions seems to have been that if the defendant was possessed of money he had no motive to rob Harold Cotton. But the interpretation that "holding" could refer to money had already been elicited. Explanation and connection, not offered, would be needed to justify an excursion into lodgers' drug habits.

(c) Over objection, the prosecutor put to the medical examiner, a defense witness, a question as to time of death which went on the assumption that the victim had had his last meal about 7 P.M. The contention that there was not enough evidence to justify a 7 P.M. hypothesis ignores the record. The lodger Fredette (see note 4 *supra*) testified that he had a meal with the victim in room 406 at a time that could be placed shortly before seven by reference to the TV news programs heard around that time.

(d) Paul Conley, employed as a chemist at the Commonwealth's Department of Public Safety, testified that he analyzed stains on the defendant's shirt and on clothing taken from the victim's body and found them to consist of human blood, unamenable to typing. The defense challenged the qualifications of this witness as an expert, but in the light of the witness's training and experience the judge acted plainly within his powers in rejecting the challenge. See *Commonwealth* v. *Seit*, 373 Mass. 83, 92 (1977). He later instructed the jury properly as to the attitude they should assume with respect to testimony by an expert.

(e) Counsel for the defendant objected to the judge's interrupting him at two points in his closing statement to the jury. When counsel began to describe to the jury what they might expect to hear from the judge in his charge, the judge interrupted to say that counsel had limited time to speak to the jury and his function was to point out the facts. Counsel said he thought he could comment appropriately on what the jury might expect, whereupon the judge said if counsel wanted to use his time so, he could go ahead. As it happened, the judge had occasion to interpose for the same purpose during the prosecutor's closing. In his charge he explained these actions to the jury. The judge was well within his sphere in these suggestions to the lawyers. He also acted properly in interjecting that the medical examiner who testified was simply functioning as an official; this as a corrective to defense counsel's insinuation that as the witness was paid by the Commonwealth he might be biased in the Commonwealth's favor. See *Commonwealth* v. *Pettie*, 363 Mass. 836, 839-842 (1973).

3. In arguing for reduction of the sentences under our § 33E power, the defendant merely rings changes on his argument about the defendant's alleged intoxication. The judge, however, charged the jury about drunkenness as possibly negating the premeditation required for a finding of murder in the first degree, see *Commonwealth* v. *Sheehan*, 376 Mass. 765, 775 (1978), and also put to the jury whether the defendant's condition was such that they should exclude from their consideration any or all of the defendant's admissions on the morning of January 26 (including those made to Davi). The jury's verdicts indicate how they found. This was a brutal murder—twenty-four stab wounds with a penetration at maximum of five inches—carried out purposefully by a young man on an elderly victim. On an appraisal of the whole record we do not find reason to interfere with the sentences pronounced.

*Judgments affirmed.*