COMMONWEALTH *vs.* ROBERT L. NERO.

Hampden. September 20, 1982. — November 29, 1982.

Present: BROWN, DREBEN, & KASS, JJ.

*Evidence,* Admissions and Confessions. *Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Assistance of counsel.

Inculpatory statements to police by an arrested person, who had received Miranda warnings and who at no time invoked his right to remain silent or to have counsel present, were not rendered involuntary by the fact that, prior to his statements, he had been incorrectly informed by a police officer that another participant in the crime had named the defendant as his accomplice. [716-719]

A judge had sufficient basis to conclude that a criminal defendant, whose reasons for requesting a change of counsel on the day before trial were unpersuasive, had knowingly and intelligently elected to proceed without counsel. [719]

INDICTMENTS found and returned in the Superior Court Department on July 23, 1980.

The cases were tried before *Moriarty, J.*

*Philip H. Lauro* for the defendant.

*William T. Walsh, Jr.,* Assistant District Attorney, for the Commonwealth.

KASS, J. While in police custody, the defendant Nero made inculpatory statements. His motion to suppress those statements on the ground that they were improperly induced by the police was denied, and that denial furnishes one issue on appeal; the other issue concerns whether defendant was granted his right to effective assistance of counsel. We affirm the defendant's convictions of breaking and entering in the nighttime with intent to commit a felony and for larceny of more than one hundred dollars.

From the trial judge's findings, which we accept in the absence of clear error, *Commonwealth* v. *Moon,* 380 Mass.

751, 756 (1980),[1] we learn the following:  Two police cruisers responded to a report of a break in progress at a Chicopee motel, the Fairfield Inn, and were rewarded by finding a man with a television set in his arms.  The trunk of the car by which he was standing was open, and another television set was already in the trunk.  The police at once arrested the man with the television set — whose name was Cochran — and a woman — Laverncie Gasque — who was inside the car into which the sets were being loaded.  From the physical facts, one of the arresting officers deduced that Cochran must have had an accomplice and asked about him.  Cochran, after an initial denial, admitted there was an accomplice and gave a false name for the collaborator.

Meanwhile, another officer, Bruce Carter, arrived at the motel from a different direction.  He met three men, of whom the defendant Nero was one.  Nero obligingly pointed to where the arrest of Cochran and Gasque was in progress.  Officer Carter moved on, and Nero literally took to the woods.  As soon as the arresting police brought Carter up-to-date, Carter realized that he and the defendant had met and that the latter had given him the slip.  A check of the registration of the car in which the television sets were to be carted off disclosed that the car belonged to the defendant Nero, and the police, reasonably, deduced that Nero probably was the missing accomplice.  A State police trooper arrested Nero, who was on foot on the Massachusetts Turnpike, not far from the Fairfield Inn.

Before questioning began at the Chicopee police station, Nero received the Miranda warnings.  He is a very intelli-

---

[1] See also *Commonwealth* v. *Doyle,* 377 Mass. 132, 138 n.6 (1979), in which the court stated that "with regard to the attitude owed by the reviewing court to the trial judge who rules on a motion to suppress, . . . it is for that judge to resolve questions of credibility; . . . his subsidiary findings are to be respected if supported by the evidence; . . . his findings of ultimate fact deriving from the subsidiary findings are open to reexamination . . ., as are his conclusions of law, but, even so, . . . his conclusion as to waiver is entitled to substantial deference."

gent man, had heard the warnings read to him on other occasions, and understood them thoroughly. Earlier in the evening Nero had done some drinking, but he was not intoxicated. At the request of Thomas F. Gilmartin, the detective who sought to question him, Nero signed a card acknowledging that he had been advised of his rights and that he understood them.

Detective Gilmartin then told Nero he was under arrest for stealing television sets from the Fairfield Inn and that Cochran had implicated Nero by name in the aborted theft. Nero resisted Gilmartin's subsequent invitation to sign a written statement, but did make an oral inculpatory statement. Exactly what he said was sharply disputed, but the defendant asked to have any version of his statement suppressed.

Gilmartin was mistaken when he told Nero that Cochran had identified him by name as an accomplice. Cochran had merely acknowledged the existence of a man whose name was Robert and had provided the police with a fictitious last name for him. The motion judge (who was also the trial judge) found that "Officer Gilmartin, however, did not deliberately lie to the defendant. He knew that the police had obtained the name of Robert L. Nero from some source and had broadcast it over the police radio. . . . He assumed . . . in good faith . . . that [the police] had obtained the defendant's name from Cochrane [sic]." Indeed, Gilmartin seemed to be under that impression when he began his testimony at the suppression hearing.

1. *Voluntariness of the Defendant's Statement.*

Unlike the factual setting of *Commonwealth* v. *Jackson,* 377 Mass. 319, 325-328 & n.8 (1979), in which the police deliberately gave false information to the defendant for the purpose of bluffing him into damaging admissions, and the defendant was so tricked, here there was no intent by Detective Gilmartin to deceive. The use of false information as a tactical device is strongly disapproved and casts instant doubt on whether a defendant's statement is voluntary. *Id.* at 328 n.8. See, e.g., *Commonwealth* v. *Dustin,*

373 Mass. 612, 615-616 (1977), cert. denied, 435 U.S. 943 (1978) (statement not voluntary where police suggested to suspect it could not be used against him); *Commonwealth* v. *Jackson, supra* at 324 (police falsely told suspect that his girlfriend had made statement implicating herself, and suspect thereupon made an inculpatory statement); *Commonwealth* v. *Meehan,* 377 Mass. 552, 563-564 (1979), cert. dismissed, 445 U.S. 39 (1980) (in context deceptive statements by the police could be seen as having undermined the suspect's choice to remain silent); and *United States ex rel. Everett* v. *Murphy,* 329 F.2d 68 (2d Cir.), cert. denied, 377 U.S. 967 (1964) (confession invalid when it followed an outright fabrication of a crucial fact by the interrogator, coupled with a promise of police assistance to reduce the charges).

Although officially dispensed misinformation is always relevant to, and a warning signal for, the issue whether there has been a voluntary waiver of the right to remain silent, the resolution of the issue turns, in the end, on an analysis of the entire circumstances in which a damaging admission has been made. So, for example, in *Frazier* v. *Cupp,* 394 U.S. 731, 739 (1969), a misrepresentation that an accomplice had confessed did not vitiate a defendant's confession; in *United States ex rel. Lathan* v. *Deegan,* 450 F.2d 181, 185 (2d Cir. 1971), cert. denied, 405 U.S. 1071 (1972), a "mere deception by an interrogator, *ipso facto,* [did] not invalidate a confession" because, in the circumstances, it was doubtful that the deception had induced the confession; in *United States ex rel. Hall* v. *Director, Dept. of Corrections,* 578 F.2d 194, 195-196 (7th Cir.), cert. denied, 439 U.S. 958 (1978), a confession was found to be voluntary despite deliberate exaggeration by police of statements made by codefendants because the misinformation was insignificant in comparison with the defendant's knowledge of other evidence connecting him to the crime; and in *United States ex rel. Riley* v. *Franzen,* 653 F.2d 1153, 1163 (7th Cir.), cert. denied, 454 U.S. 1067 (1981), misinforming a seventeen year old boy that his brother had confessed did not, in the circumstances, render a confession involuntary.

In the instant case the trial judge, noting twice that the defendant is very intelligent, found, "The circumstantial evidence against him was very strong,[2] and I am certain he recognized it as such. The added bit of misinformation had very little if any influence on his decision to talk to the police." According to the arresting officer, Nero received Miranda warnings en route from the place of his arrest to the scene of the break-in. He received those warnings again prior to interrogation at the police station. During the ride from his arrest back to the motel, Nero laughingly told policemen that they had almost stepped on him in the woods across from the motel. It is significant that the defendant never invoked his right to remain silent nor his right to have counsel before he began to make his inculpatory statements. Compare *Edwards* v. *Arizona*, 451 U.S. 477, 484, in which the Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." See *Commonwealth* v. *Mandeville*, 386 Mass. 393, 403 (1982), in which the court observed that the Commonwealth's burden of proving a knowing and intelligent waiver of the right to remain silent is somewhat lighter (albeit still heavy) when there is no indication that the defendant has asked to cut off questioning. Such a request must be scrupulously honored. *Commonwealth* v. *Brant*, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980). See generally Brown, Gross & Ryan, Future Judicial Oversight of the Conduct of Custodial Interrogations: A Growing Massachusetts Responsibility, 62 Mass. L.Q. 143 (1977). We conclude that the record supports the judge's findings that the defendant's statements were made voluntarily, i.e.,

[2] The presence of a purloined television set in a car registered to the defendant, his presence at the scene, and his departure on foot to the Massachusetts Turnpike were going to require some explanation.

knowingly and intelligently, independent of the misinformation which the defendant received from the police.

2. *Right to Effective Assistance of Counsel.*

On the day Nero's trial was to begin his appointed counsel, Mr. Seymour Tillman, moved to withdraw. Asked for an explanation by the judge, Mr. Tillman said Nero wanted to conduct the trial himself, as "co-counsel," or, if he could not do that, wanted a new lawyer appointed. In response to questions from the judge, Nero expressed dissatisfaction with Mr. Tillman's responsiveness and preparedness. The docket disclosed, however, that Mr. Tillman had attended at least two pretrial conferences, had requested the Commonwealth to produce exculpatory evidence, and had filed motions to suppress, to subpoena a witness, and for a writ of habeas corpus to produce an incarcerated witness. The judge denied the request to appoint another lawyer and gave the defendant the option to use Mr. Tillman or proceed pro se with Mr. Tillman standing by should the defendant need trained advice. He also warned Nero against jettisoning his counsel. Nero elected to proceed pro se, although he refused to sign a waiver-of-counsel form. There was no error.

Nero's reasons for changing counsel were unpersuasive, and his request was suggestive of a delaying tactic. There was sufficient basis for concluding that Nero was making a knowing and intelligent choice. See *Johnson* v. *Zerbst,* 304 U.S. 458, 464 (1938); *Faretta* v. *California,* 422 U.S. 806, 835 (1975); *Maynard* v. *Meachum,* 545 F.2d 273, 279 (1st Cir. 1976); *Fillippini* v. *Ristaino,* 585 F.2d 1163, 1167 (1st Cir. 1978). The case is governed by *Commonwealth* v. *Flowers,* 5 Mass. App. Ct. 557, 565-566 (1977), cert. denied, 434 U.S. 1077 (1978). Contrast *Commonwealth* v. *Cavanaugh,* 371 Mass. 46, 52 (1976). Parenthetically, Nero did remarkably well as his own lawyer. It was his examination which smoked out that Detective Gilmartin was in error in thinking — and saying — that Nero's cohort Cochran had identified Nero by name.

*Judgments affirmed.*