Agnes, Peter W., J.
I.INTRODUCTION
1. The defendant is charged by indictment with four counts of Rape of a Child (G.L.c. 265, §22A), Assault with Intent to Commit Rape (G.L.c. 265, §13B), and Indecent Assault and Battery on a Child Under the Age ofFourteen (G.L.c. 265, §13B). The defendanthas filed a pretrial motion to dismiss based on the claim that the Commonwealth presented the grand jury with a distorted picture of the evidence in violation of Commonwealth v. O’Dell, 392 Mass. 445 (1984). The defendant also filed a pretrial motion to suppress statements he made to the police on grounds that they were not voluntary.
FACTUAL BACKGROUND
2. The essential facts are not in dispute. The record contains a report by the mother of the alleged victims, six-and nine-year-old females, that indicates that her children told her that they had a sleep over in late February with their friend Santiago, the young nephew of the defendant, who lives across the street. The children said they were in bed with Santiago and his uncle, the defendant, when the defendant engaged in anal intercourse with one child and put his penis in the mouth of the other child. On March 12, 2009, the defendant was transported by the Worcester Police Department from his place of employment at Webster Square Golden Pizza to the Worcester Police station. The initial conversation with the defendant was in English. At the police station, the defendant was led into an interrogation room, a windowless area approximately ten feet by ten feet containing a table, four chairs and one doorway. Worcester Police Officer Angel Rivera, who is Spanish speaking, served as the interpreter. Officer Detective Mark Jolin was the principal interrogator.
3. The parties agree that the transcript prepared by the defendant and received as an exhibit is a fair and accurate rendering of the interview of the defendant on March 12,2009. There is also an audio video record of the interview and a DVD containing that data is an exhibit in this case.
4. The defendant informed the police at the outset of the interview that he understood that the interview would be recorded. He also stated that he did not speak English veiy well, but he did understand it. Transcript of Defendant’s March 12, 2009 Interview at 1 (hereafter, “T.’j.
5. The defendant was informed of his rights under Miranda v. Arizona, 384 U.S. 366 (1966), and indicated that he understood them. The defendant expressed a willingness to answer the questions of the police. A written Miranda waiver form in Spanish was signed. The time was 7:30 p.m. T. 2-3. The defendant was asked about his living arrangements and explained that he lived with his sister and brother-in-law, a nephew, a niece, and a third adult. The three men worked together at the pizza shop. T. 4-5, 7. The defendant indicated he had come to the United States from Mexico about 18 months earlier and that this was the second time he had come to this country. T. 5. The defendant told the police his niece Emily was going to be three years old and his nephew Santiago is eight years old. The defendant acknowledged a prior arrest for soliciting an undercover police officer posing as a prostitute. T. 8-9. The defendant indicated he drank beer, used marijuana, but did not use other drugs. T. 10. .
*34 6. The defendant told the police that about two weeks earlier, one of his cousins invited him to come to another pizza store to play cards. A group of friends were there and they played cards. The defendant was then invited to go down to the basement where he was attacked by four of them, and was beaten by these men as well as by his cousin. The defendant said when he asked them why they were beating him, they simply said again and again “y°u know.” T. 11-12. The defendant said he asked the group whether they were upset over an incident involving his cousin’s girlfriend, but he was told instead it was about things he had done to his cousin’s daughters. T. 12-13. The defendant identified the two girls and acknowledged that they had slept over his house on more than one occasion. The defendant added that his cousin was accusing him of having done something to the girls on an occasion about fifteen days ago, but the defendant denied that he was at home that evening. The defendant indicated that there were at least two occasions in the last year when the girls slept over at his house, but indicated that he was not at home on any such night during 2010. T. 17-19.
7. As the interview progressed, the police suggested that the defendant did not seem like someone who would harm children when he was not drunk, that because the children were so upset about what they say happened to them that the allegation must be true, and that the police could get help for the defendant’s drinking problem. T. 22-23. The defendant also told the police that his sister spoke to the mother of the alleged victims, supported the defendant’s story that he had not done anything to the girls, and asked their mother to have them “checked out.” T. 24-25. In response, Detective Jolin told the defendant that the girls had been “checked out” and one in particular had “tears in her anus.” T. 25.
8. The defendant also stated that the father of the alleged victims beats them. T. 26-27. The police, in turn, told the defendant that they were not concerned with bruises: “I am worried about a little girl who was raped! OK.” T. 26. Further, the police remarked, “there’s no doubt that it happened, because there is medical evidence to prove it. OK?” T. 26. The police also stated that the two little girls identified the defendant as the perpetrator and were afraid of him because he did bad things to them. T. 26. The defendant denied any wrongdoing and denied being drunk around the children. T. 26.
9. The police pressed the defendant to admit that he had been at home recently while the young girls were present and had come into contact with them. The defendant did admit playing with the girls for some time while his sister was doing house cleaning. T. 26. “I played a little bit with them, because they were always asking me to play with them.” T. 28. He also explained that he was referring to his cousin’s children who he regarded as his nieces. T. 29. The defendant said that he played video games until he lost and then took a shower and went to bed. He denied drinking alcohol, using drugs, or any further interaction with the children. T. 30.
10. The police told the defendant they did not believe him and suggested that because the children had made these accusations and were so upset the defendant should admit that he did bad things to them. T. 33. When the police suggested that because the children were making the accusation it must be true the defendant agreed. The police said that the defendant should “be a man” and tell them what had happened, indicated that they could get “help” for him, and suggested that maybe he had not done anything intentionally. The defendant replied “maybe, the only thing I remember from that night was when I was in my right mind, because, drunk, maybe yes . . . Maybe I did do the girl drunk but, I don’t think so.” T. 35. The defendant maintained that if anything had happened he was drunk and the police responded. The police pressed the defendant to admit his involvement and to spare the children from the pain of having to continue to tell the story.
11. Later in the interview, the defendant admitted he was drinking and stayed up playing with one of the girls after his nephew went to bed. When the police suggested that the defendant got behind one of the children and pulled her pants down, he said he did not recall. T. 39. The police continued to press him by telling him that they knew it had happened, that the alleged victims were put through an ordeal, and that he would feel relieved by admitting what he had done. T. 39.
12. The defendant continued to express ambivalence about what he remembered and what he may or may not have done. The police continued to offer help for his alcohol problem. The police suggested that the “evidence from the doctors,” the story told by the children and what the defendant said “fits together like a big puzzle.” T. 40. After telling the defendant again that the children are sure it happened and “the doctors are saying it did happen to them, the defendant stated that ”1 did it," and then added he didn’t recall it. T. 41. The defendant denied ever doing anything to his nephew Santiago. T. 41. Later, the defendant explained that if he had not been drinking he would not have done anything to the girls. T. 42. But moments later, when the police suggested that the defendant pulled down the girls’ pants, the defendant stated that he did not do anything to them. T. 42. Then the defendant again acknowledged that he might have done something if he was drunk. The defendant later acknowledged committing some specific sexual acts involving the girls. T. 46-47.
13. The record before the court also includes records of medical examinations of the two alleged victims. These reports were available to the police prior to the interview of the defendant on March 12th. The *35 examination of the nine-year-old female included a genital examination and was “normal, which neither rules out nor confirms the possibility of sexual abuse or prior penetration.” The examination of the six-year-old female included a genital examination and was “normal, which neither rules out nor confirms the possibility of sexual abuse or prior penetration.”
14. This matter was presented to the Worcester County Grand Juiy on May 4, 2009. A transcript of the proceedings is part of the record before the court. The sole witness for the Commonwealth was Worcester Police Detective Mark Jolin. He testified that he was a member of the “Special Crimes Unit” which investigates, among other things, sexual assaults. Grand Juiy Minutes, page 3 (hereafter, “GJ”). Detective Jolin testified that he was assigned to investigate allegations that the defendant, Javier Heurta Gonzalez, had sexually assaulted two young females, identified for purposes of this Memorandum of Decision as X and Y, at his apartment in January 2009. GJ at 4. At the time of the alleged assaults, one child was eight years old (X) and the other child was six years old (Y). GJ at 5. At the time of the incident, the defendant was living with his sister, her husband and their son Santiago and daughter Emily across the street from the home where the alleged victims resided. The families were originally from Mexico and well known to each other. Detective Jolin testified further that SAIN interviews were conducted with each of the alleged victims on March 10, 2009 which Detective Jolin observed through a one-way mirror. GJ at 6-7. Detective Jolin testified that the recorded interviews were available to be viewed by grand jurors if they requested. A recording of the interview was not played for the grand jury nor was one marked as an exhibit. Detective Jolin testified that X, the older female, was in Santiago’s room playing video games with him. GJ at 7. Her younger sister, Y, was sleeping in the mother’s room.
15. Detective Jolin testified further that X described the incident during the SAIN interview as consisting of the defendant coming into the room where she was playing with Santiago, asking her to lay down with him (the defendant) on the bed, putting a blanket over them, pulled down her pants and his pants and put “his balls” into “where the poop comes out.” Detective Jolin testified that X did not know the difference between “balls” and a “penis.” GJ at 8. She said the defendant squeezed her veiy hard and that the event lasted about 10 minutes. Meanwhile, she said Santiago was playing a video game. She told the defendant she had to go to the bathroom and got up and left the room. She wiped herself and found spots of “yellow stuff that looked like pee on the toilet paper.” She also said that the defendant was banging on the bathroom door and telling her in Spanish that he “wanted to do it again to her.” He managed to open the door but she was able to run away and avoid him. GJ at 9. The defendant told her that if she told her parents she would be in trouble. GJ at 9. X also said during the SAIN interview that the defendant “did something to her sister” Y that evening. X stated that at some point Santiago’s mother put her sister Y into the bedroom where X and Santiago were sleeping. X reported that while she pretended to be asleep, she saw the defendant “put his balls on Ys face" and prevent her sister from moving him away from her. GJ at 10. Y made a similar report of the defendant’s conduct during her SAIN interview. GJ at 11. Detective Jolin also testified that Y drew a picture of the defendant’s “balls” which depicted a penis.
16. Detective Jolin also explained that sometime during the month following the alleged incidents, X was taking a shower with her mother and complained that “her butt hurt,” but denied that anyone had done anything to her. GJ at 12. He also testified that the older sister of X and Y gave a statement to the police in which she indicated that on February 28, 2009, she was walking near her home with her sisters, X and Y, when they observed the defendant who appeared to be looking at Y, her younger sister, “in a way that a man should not be looking at a little girl.” GJ at 14. This event apparently prompted X and Y to tell their sister they had something private to tell her. Y said that the defendant had tried to put his private part in her mouth and X told their sister’s friend that the defendant had put his private part in her butt. GJ at 15. The older sister of the alleged victim then informed their parents. GJ at 16.
17. Detective Jolin went on to testify that he and other detectives located the defendant at his place of employment and asked him to come to the police station for questioning. He added that the defendant was given his Miranda rights in English and Spanish and that he signed a written waiver that was printed in Spanish. GJ at 20. Again, Detective Jolin informed the grand jurors that the recorded interview was available for them to view if they wished, but the record does not indicate that they viewed it or that it was marked as an exhibit. Detective Jolin testified that the defendant told the police that about one month before the interview he was playing video games with his nephew Santiago and that sometimes when he drinks he “gets veiy drunk,” and if he was drunk he may have done something to X. GJ at 22. Detective Jolin added further that the following morning when he woke up, he (the defendant) “thought that he might have done something to the girls. I asked what he did, but Huerta would only say that he knew he did something to the girls, but he could not remember. He said he remembered that he did something to [X] with his hands, but that he could not remember anything else.” GJ at 22. Detective Jolin said the defendant told the police “he wanted help with his alcohol problem." GJ at 23. Finally, Detective Jolin told the grand jury that each of the alleged victims participated in a physical examination by a physician associated with the Child Pro *36 tection Program at U. Mass. Medical Center. The report indicated that child X’s anus had “normal tone with no scars, tags or fissures,” and that “the physical examination was normal, quote which neither rules out nor confirms the possibility of sexual abuse or prior penetration.” GJ at 23.
DISCUSSION
18. Motion to Dismiss. The defendant’s motion to dismiss is based on two claims. First, the defendant claims that the statement he made to the police should be suppressed as involuntary, and, therefore, it was error to present them to the grand jury. The general rule, however, is that the exclusionary rule is not enforced in proceedings before the grand jury. See United States v. Calandra, 414 U.S. 338, 348-50 (1974); Commonwealth v. Saya, 14 Mass.App.Ct. 509 (1982). Second, the defendant maintains that the prosecutor presented misleading evidence about the physical examination of the alleged victims in violation of the principle in Commonwealth v. O’Dell, 392 Mass. 445 (1984). Dismissal of an indictment is not warranted where the defendant merely shows that the prosecution presented false or deceptive evidence to the grand jury. Rather the defendant must show (1) that false or deceptive evidence was given to the grand jury knowingly or recklessly, for the purpose of obtaining an indictment; and (2) that the presentation of the false or deceptive evidence probably influenced the grand jury’s determination to indict. Commonwealth v. Tavares, 27 Mass.App.Ct. 637, 639 (1989).
19. Motion to suppress. “At a suppression hearing, there is an initial presumption that the defendant’s statement is voluntary, placing the burden on the defendant to produce evidence tending to show otherwise.” Commonwealth v. Crawford, 429 Mass. 60, 65 (1999), citing Commonwealth v. Harris, 371 Mass. 462, 471 n.3 (1976). Once the defendant comes forward with evidence from any source that raises a live question regarding whether the police complied with the Miranda doctrine or a confession or incriminating statement was voluntary, the judge has a responsibility to make findings of fact that are sufficiently detailed and complete to enable the appellate court to perform its function. Commonwealth v. Mello, 420 Mass. 375 (1995).[1] When voluntariness is a “live” issue the Commonwealth has the burden of proving voluntariness by a standard of proof beyond a reasonable doubt and this must be demonstrated with “unmistakable clarity.” See Commonwealth v. Tavares, 385 Mass. 140, 149-53 (1982). “There is no bright line test for volun-tariness . . . [The court must] consider all of the relevant circumstances surrounding the statement and the individual characteristics and conduct of the defendant.” Commonwealth v. Burbine, 74 Mass.App.Ct. 148, 153 (2009), and cases cited. The Massachusetts totality of the circumstances test, unlike its federal counterpart, incorporates both the common law’s concerns about the reliability of confessions that are influenced by or the product of promises, threats, or other forms of improper inducements, and the Due Process concerns about the fairness of certain types of interrogation methods used by the police. See Commonwealth v. Harris, 371 Mass. 462, 468 (1971). The Massachusetts test is also broader than federal law in that it looks at the capacity of the defendant to make a rational choice about whether to speak apart from the conduct of the police or private parties. “A statement is voluntaiy if it is the product of a rational intellect and a free will, and not induced by physical or psychological coercion.” Commonwealth v. LeBlanc, 433 Mass. 549, 554 (2001) (quotations omitted).
20. For a number of different reasons, voluntariness is a live issue. This is a case in which the police misrepresented the evidence on a number of occasions by telling the defendant that the physical examination of the children revealed that X had a torn anus (T. 25). The police also told the defendant that the “medical evidence proves that something happened.” (T. 34,40.) The police added that “[t]he doctors are saying that it did happen to them [the children].” T. 41. The police again stated that "[ajnd we got medical evidence saying that they were touched.” T. 49. Finally, the police made reference to the fact that “[t]he doctors know” what happened to the girls. T. 50. See Commonwealth v. Nero, 14 Mass.App.Ct. 714, 716 (1982) (strongly disapproving of such tactics). As the defendant points out in his brief, the police had medical evidence that was contrary to the representations they made to the defendant, and had no evidence to support their representations that the physical examination of the alleged victims was consistent with a sexual assault or that one of the children had a torn anus. Defendant’s Memorandum of Law at 6-7. When the police use deception as an interrogation technique, as in this case, it casts doubt on the voluntariness of a resulting confession. Commonwealth v. Jackson, 377 Mass. 319, 328 n.8 (1979).[2]
21. In addition, the police told the defendant that they could get help for his drinking problem. See T. 23 (police advise defendant that if he was drunk and has problems they can help him); T. 40 (“We can get you in a program for your alcohol”). Even though the police made no explicit promise of leniency, a reference to benefits such as alcohol treatment may be phrased in such a way that the subject of the interrogation understands it as an implied offer of assistance in exchange for a confession. Commonwealth v. DiGiambatista, 442 Mass. 423, 435-36 (2004). Finally, the police used a technique often employed in the interrogation process known as “minimization” whereby they sought to elicit incriminating statements about the defendant’s role in sexually assaulting the two children by suggesting that these were not the kinds of things he would have done if he had not been drunk. See T. 20. See also T. 34 (“Because you seem like a nice guy and I can’t believe that you purposely hurt them”); T. 36 (“you don’t look like a person who *37 was going to do it intentionally”); T. 48 (“It’s the booze that made you do that. Booze makes people. It affects people differently. Some people are happy drunks. Some people . . .”). T. 53 (“And we know it’s not you it’s the booze”). Minimizing a crime implies leniency. See Commonwealth v. O’Brien, 445 Mass. 720, 727 (2006); Commonwealth v. DiGiambatista, 442 Mass. at 431.
22. The police also misstated the law during the interrogation by telling the defendant that if he tells the police what happened “these little girls won’t have to ever tell it again. And they’ll never have to say it again.” T. 52. See Commonwealth v. Novo, 442 Mass. 262 (2004) (Court strongly criticizes the Commonwealth because the police interrogators repeatedly told the defendant that his right to present his side of the case at trial depended on telling his story to the police).
23. In Commonwealth v. DiGiambatista, the Supreme Judicial Court observed that merely because the technique of minimization is used does not compel the conclusion that a confession is involuntary.[3] Id., 442 Mass. at 439. However, when the police combine the technique of minimization with false statements about evidence pointing to the defendant’s guilt, as they did in this case, it creates doubt about the voluntariness of his statements. Id. at 439, citing Commonwealth v. Nero, supra.
24. The combination of false statements about the evidence, offers to help the defendant with his alcohol problem, and repeated statements tending to minimize the defendant’s culpability lead to the conclusion that the Commonwealth has failed to meet its burden of proving voluntariness beyond a reasonable doubt.
ORDER
For the above reasons, the defendant’s motion to dismiss is DENIED. The defendant’s motion to suppress is ALLOWED. Determining the precise point in the interview in which the statements are no longer voluntary requires a consideration of the totality of the circumstances. Based on all the relevant considerations, it is the order of this court that any and all statements made by the defendant following the point when the police stated that the alleged victims “are actually traumatized” are suppressed. This moment, according to the transcript, occurs at counter 47:09.

The defendant also challenges the validity of the waiver of Miranda rights which is a separate question from voluntar-iness. The record does not indicate that the advice given to the defendant was incomplete or misleading or that the defendant did not understand his Miranda rights. The execution of a signed waiver of rights on a form in Spanish is further evidence that the defendant understood and waived his rights. Arguably, the conduct of the police after the defendant waived his rights, described in the text, infra, could be described as a violation of Miranda’s continuing duty that the police must scrupulously observe the defendant’s rights. That is a question best left for another day.

It also is significant that the police interrogation in this case consisted primarily of leading questions. Very little of any incriminating statements by the defendant were not supplied by the police. See State v. Retettenberger, 984 P.2d 1009, 1019 (Utah 1999).

The defendant certainly made incriminating statements to the police, but he did not confess in the traditional sense.