## Commonwealth vs. Rui Novo.

Bristol. May 4, 2004. - August 6, 2004.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Evidence,* Admissions and confessions, Voluntariness of statement. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Voluntariness of confession.

Discussion of the standard of review of findings based on documentary evidence such as a recorded confession. [266]

Police officers' coercive interrogation tactics that repeatedly misrepresented a criminal defendant's trial rights, including his right to defend himself, irretrievably tainted the defendant's confession, rendering it involuntary [266-270]; however, statements made by the defendant prior to the specific acts of coercive police conduct were made voluntarily [270] after a valid waiver of the defendant's Miranda rights [270-272] and could be admitted in evidence at trial.

Indictment found and returned in the Superior Court Department on August 12, 2003.

A pretrial motion to suppress evidence was heard by *Richard J. Chin,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Greaney,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*Robert J. Schilling,* Assistant District Attorney, for the Commonwealth.

*Daniel Bennett* for the defendant.

Cordy, J. This case requires us to determine whether police interrogation tactics used to secure a suspect's confession during the course of a videotape recorded interview made the confession involuntary. We conclude that the motion judge correctly suppressed the confession itself, but that statements made prior to specific acts of coercive police conduct were voluntary, and can be admitted in evidence at trial.

1. *Background.* Rui Novo stands indicted for murder in the

first degree, stemming from the death of Joshua Santos, the two year old son of Novo's girl friend, Melissa Santos. Novo and Santos brought Joshua to St. Luke's Hospital in New Bedford on April 1, 2003, where he later died. Joshua's subsequent autopsy revealed severe bruising and internal injuries, and that his death was a homicide.

On April 3, 2003, State police Detective William Serpa contacted Santos and Novo and asked them to come to the police station for an interview concerning Joshua's death; Novo and Santos agreed, and Serpa drove Novo to the New Bedford police station, while other officers took Santos to the State police detective unit in New Bedford. Serpa and Officer Christopher Cotter of the New Bedford police interviewed Novo, and the entire interview was recorded on videotape.

At the beginning of the interview, Serpa read Novo the Miranda warnings from a New Bedford police department waiver of rights form. After reading each right, Serpa asked Novo if he understood, and in each instance Novo responded, "Yes." When Serpa described the rights as "Miranda rights," Novo nodded, indicating his familiarity with the term. One of the rights given was as follows: "[I]f you decide to answer any questions now, with or without an attorney, you still have the right to stop the questioning at any time for the purpose of consulting an attorney."

Novo agreed to answer the officers' questions and, after providing background information, gave a detailed account of his activities from the afternoon of Monday, March 31, 2003, through his arrival at the hospital on Tuesday, April 1, 2003. Novo made clear that Joshua had been with him and Santos exclusively at all times. Although Joshua did not appear ill during the day Monday, he complained of being tired and went to bed at 6 P.M. Monday evening. When Novo checked on Joshua around 8 P.M., he found Joshua lying in his bed in a puddle of vomit. Novo bathed Joshua, Santos cleaned up the vomit, and Joshua was put back to bed. At approximately 7:45 A.M. the following morning, Novo found Joshua watching television in the living room, and there were puddles of vomit on the coffee table and carpet. Joshua vomited several more times during the day, once when Santos tried to give him a vitamin milkshake,

and several more times in various rooms in Novo's apartment. Novo and Santos then brought Joshua to the hospital.

At this point in the interview, the officers left the room for several minutes. When they returned, Serpa showed Novo photographs of Joshua's body and questioned him about the source of the numerous bruises that were evident. Novo stated that he had seen bruises on Joshua before but believed them to be from rough play. Serpa then informed Novo that Joshua had undergone an autopsy, and that the cause of death was "massive, massive injuries from beatings." Novo repeatedly stated that he never beat Joshua, and Serpa responded by stating that this was Novo's "only opportunity" to explain the bruises and that Novo could not "help [him]self any other time but right now."

Serpa then used a number of techniques in an attempt to convince Novo to admit that he caused Joshua's bruises. First, he falsely told Novo that Santos was "giving a statement right now" and "talking about all sorts of abuse," falsely stated that the medical examiner had taken fingerprints from the bruises and that the officers had "done the measurements" on Novo's fingerprints and "[i]t's you," and expressed empathy as a parent for the frustration of dealing with a vomiting child. Novo continued, however, to deny that he was responsible for Joshua's injuries.

Then Serpa focused on the effect that Novo's failure to confess would have on a subsequent criminal prosecution, telling him, "If you don't give us a reason [for hitting Joshua], Roy,[1] if you don't give us a reason right now why you did this, a jury's never going to hear a reason." This "now-or-never" theme — that if Novo did not offer a reason for hitting Joshua to Serpa, he would be unable to offer a reason to a jury later — continued through the remainder of the interview.[2]

Finally, several minutes later, Serpa explained that a convic-

---

[1]Novo informed the officers that he goes by both "Rui" and "Roy," and Serpa and Cotter referred to Novo as "Roy" throughout the interview.

[2]Serpa and Cotter echoed the now-or-never theme eighteen additional times over the course of the remainder of the interview, twelve of which explicitly made reference to the jury never hearing Novo's story unless he told it to the officers: "If you don't give us the reason why this happened, Roy, a jury's never going to hear your side of the story, and all they're going to see are

tion of murder in the first degree carried a life sentence, and stated, "You don't give yourself a reason why this happened, Roy, you're going first-degree murder. You're going life in prison without parole." This theme — that, unless Novo offered an explanation, he would be charged with murder in the first degree — also reappeared throughout the remainder of the interview.

More than two hours into the interview, Novo stated that he "suppose[d]" that he caused the injuries to Joshua. Shortly thereafter, he admitted causing them, and was placed under arrest and charged with Joshua's murder.

Novo moved to suppress all of his statements, and, after a hearing at which Serpa testified and the videotape was played, a Superior Court judge granted the motion. The Commonwealth sought leave to proceed with an interlocutory appeal, and a single justice of this court allowed the interlocutory appeal and transferred the case here.

---

these [autopsy] pictures"; "this is your one opportunity to help yourself out"; "This is your one opportunity, Roy"; "This is your one opportunity, Roy, to explain what happened"; "[Y]ou're not going to have any way of explaining what happened. If you don't explain it now, Roy, you can't explain it at all"; "[W]e're not giving you another opportunity. It's now or it's never"; "Give yourself a reason why this happened, Roy. I need to hear it. The jury needs to hear it"; "You have to let them know that that's what's brought it to that point, because if you don't, Roy, they're not going to hear it. All they're going to see is this damage. They're going to have all our testimony. They're going to have the medical examiner's testimony, Roy. You're never going to be able to tell your side of the story"; "Roy, this is your only time"; "Give your version of the story now or they're not going to understand what happened"; "There are going to be parents on this jury, Roy, that — all children get sick. They're going to understand the level of frustration inherent in having a child that pukes everywhere and tries to hide it"; "You need to come clean and let us know. I mean, you need to let a jury know"; "So if you can't explain what happened, that's [the pictures] all they're going to show. Nobody's going to hear what happened, Roy. Nobody's going to hear — no one that matters. You know who matters? Your family matters, and most of all the district attorney's office and a jury matter"; "Help twelve people understand"; "all they're seeing right now is somebody who did this to this child, has no sorrow, and basically doesn't want to care"; "Do you think that they're going to side in your favor, Roy, [because you were smoking] weed with crack, an ooowee? They're not going to do that, Roy. They need an explanation"; "without your explanation of what happened, Roy, it's never going to come up, nobody's going to hear it, and all they've got to do is rely on physical evidence"; "It's going to help you by, you know, helping twelve people on that jury see that you're sorry for what you did."

2. *Discussion.* a. *Standard of review.* Typically, "[i]n reviewing whether a statement was made voluntarily, we accept the judge's subsidiary findings of fact unless not warranted by the evidence," and the "judge's ultimate findings, while open for review, are afforded 'substantial deference.'" *Commonwealth* v. *Raymond*, 424 Mass. 382, 395 (1997), quoting *Commonwealth* v. *Tavares*, 385 Mass. 140, 145, cert. denied, 457 U.S. 1137 (1982). In this case, however, the judge's findings are based almost exclusively on the videotape of Novo's confession, and "we are in the same position as the [motion] judge in viewing the videotape." *Commonwealth* v. *Prater*, 420 Mass. 569, 578 n.7 (1995).

We have consistently held that lower court findings based on documentary evidence available to an appellate court are not entitled to deference. "A judge who has seen and heard the witnesses is in a better position to determine their credibility than is a court which is confined to the printed record. The situation is different in regard to findings made upon written evidence. In that respect this court stands in the same position as did the trial judge, and reaches its own conclusion unaffected by the findings made by the trial judge." *Berry* v. *Kyes*, 304 Mass. 56, 57 (1939). This principle applies whenever the evidence before the trial court is reduced to a tangible form, and is therefore available to the appellate court in the same form as it was reviewed by the trial court. For example, neither findings based on transcripts of deposition testimony, see *Guempel* v. *Great Am. Ins. Co.*, 11 Mass. App. Ct. 845, 848 (1981), nor findings concerning the "content and significance" of photographs, *Commonwealth* v. *Bean*, 435 Mass. 708, 714 n.15 (2002), are entitled to deference. Therefore, we will "take an independent view" of recorded confessions and make judgments with respect to their contents without deference to the fact finder, who "is in no better position to evaluate the[ir] content and significance." *Id.*[3]

b. *Voluntariness in the totality of the circumstances.* "The

[3]At the hearing on the motion to suppress, the judge also heard testimony from Serpa. That testimony focused primarily on events leading up to the videotape recorded interview and on the information known to police at the time of the interview. When asked about the specifics of the interview itself, Serpa explicitly deferred to the videotape. Our review of those parts of the motion judge's findings based on Serpa's testimony is constrained by the

test for voluntariness of a confession is 'whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.' " *Commonwealth* v. *Raymond, supra* at 395, quoting *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995). "The Commonwealth . . . bears the burden of proving beyond a reasonable doubt that, in the totality of the circumstances, the defendant's statements were made voluntarily." *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000).

"A statement is voluntary if it is 'the product of a rational intellect and a free will.' " *Id.*, quoting *Commonwealth* v. *Davis*, 403 Mass. 575, 581 (1988). In evaluating the voluntariness of a statement, we consider a number of factors "including promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). Additionally, the "use of false information by police during an interrogation is deceptive and is a relevant factor indicating a possibility that the defendant's statements were made involuntarily." *Commonwealth* v. *Selby, supra* at 664. With these factors in mind, we turn to the specifics of Novo's interview.

Although the officers used a variety of interrogation techniques, one that emerged approximately ninety minutes into the interview was that this would be Novo's "only opportunity" to offer an explanation for why he hit Joshua. Once introduced, this now-or-never theme persisted up to and through Novo's confession. Soon after it was introduced, Serpa explicitly linked it to Novo's rights to testify and to present a defense when he told Novo, "If you don't give us a reason, Roy, if you don't give us a reason right now why you did this, a jury's never go-

normal, deferential standard of review: We will not overturn such subsidiary findings unless we determine that they are "not warranted by the evidence." *Commonwealth* v. *Raymond*, 424 Mass. 382, 395 (1997).

ing to hear a reason." Thereafter, Serpa repeatedly conveyed the message that, unless Novo offered a reason for injuring Joshua during the interview, he would not be able to offer any reason to a jury at a subsequent criminal case.

Serpa's statements were plainly untrue. Regardless of whether Novo offered an explanation to the officers, he would be entitled to present a defense to the jury. Far from a privilege contingent on making a statement to interrogators, "[t]he right to testify on one's own behalf in a criminal case is fundamental." *Commonwealth* v. *Degro*, 432 Mass. 319, 335 (2000). See art. 12 of the Declaration of Rights of the Massachusetts Constitution ("And every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defence by himself, or his counsel, at his election"). Nevertheless, the officers persisted, suggesting over and over again that Novo's right to tell his side of the story to a jury was conditioned on his revealing it to them during the interview: e.g., "If you don't give us a reason . . . a jury's never going to hear a reason"; "If you don't give us the reason . . . a jury's never going to hear your side of the story"; "if you don't, Roy, they're not going to hear it"; "Give your version of the story now, or they're not going to understand what happened"; "So if you can't explain what happened, [the autopsy pictures are] all they're going to show."

The Commonwealth justifies these statements as explanations by the officers that the videotape recorded interview would be the defendant's last opportunity to explain *to them*, not to the jury, what had happened. Such a characterization is belied by the officers' plain language. The officers explicitly referred to the jury throughout the latter part of the interview, and continually reinforced the notion that the interview was Novo's only opportunity to tell his story to *anyone*.[4]

The misrepresentation of Novo's right to defend himself at

_____

[4]At one point, Serpa implied (correctly) that Novo would be permitted to testify, even if he does not confess:

"All they're going to see is this damage. They're going to have all our testimony. They're going to have the medical examiner's testimony, Roy. You're never going to be able to tell your side of the story. *And if you do*, they're going to say it's bullshit, because you've had all this

trial, repeated incessantly, is a particularly egregious intrusion on rights that art. 12 declares to be fundamental.[5] It is different in degree from false statements regarding the strength or existence of incriminating evidence, which we have criticized, see, e.g., *Commonwealth* v. *Jackson*, 377 Mass. 319, 328 n.8 (1979), but not always found to be determinative of voluntariness, see, e.g., *Commonwealth* v. *Edwards*, 420 Mass. 666, 671 (1995). It is conduct that casts substantial doubt on the voluntariness of a subsequent confession and on the integrity of the interrogation process leading up to it. This doubt would be extremely difficult for the Commonwealth to overcome in any case, and it has not done so here.[6]

Because we conclude that the repeated misrepresentation of Novo's trial rights irretrievably tainted his confession, we need not determine whether any implied assurance of leniency made to Novo crossed the line we set out in *Commonwealth* v. *Meehan*, 377 Mass. 552 (1979), cert. dismissed, 445 U.S. 39 (1980),

time and now you come forward. They're going to say, 'Why the hell didn't he say it then?' " (Emphasis added.)

This one statement, however, does not mitigate the over-all effect of the officers' repeated claims that Novo would not be permitted to tell his story to the jury unless he told it to them during the interview. A person in Novo's position would certainly take the officers' statements to mean that he would not be permitted to tell the jury anything that he is not prepared to admit during the interview.

[5]This is not to say that any interrogation technique in which officers stress that the interview is the defendant's only opportunity to speak *to the police* is invalid. The officers in this case might have properly (and truthfully) told Novo, "This is your only chance to talk to us," or, "This is your only opportunity to tell your story to us so that we can help you." It is the repeated use of misinformation concerning a defendant's constitutional right to testify that rendered the interrogation in this case improperly coercive.

[6]The Commonwealth contends that Novo's "extensive familiarity with the criminal justice system, having been previously arraigned on twenty-six charges," offsets the effect of the officers' statements concerning his right to testify. This claim is belied by Novo's statements and behavior during the interview. Although Serpa unambiguously told Novo that he was going to be arrested, Novo was nonetheless surprised to learn that he would have to go to court after confessing: "But I have to go to court? . . . Why?" Novo's lack of understanding about this fundamental aspect of criminal procedure — that an accused must appear in court — demonstrates that, despite Novo's experiences in the criminal justice system, he could not be expected, in the face of the officers' now-or-never theme, to understand that he had a constitutional right to testify.

or whether misrepresentations regarding the type and strength of the evidence against him were themselves sufficiently egregious as to cast serious doubt on the confession's voluntariness. Cf. *Commonwealth* v. *Edwards, supra* at 674; *Commonwealth* v. *Selby, supra* at 664. The confession was therefore properly suppressed.

c. *Scope of exclusion.* The motion judge did not specifically address whether any other part of the statement made by Novo during his videotape recorded interview might be admissible. A judge reviewing a recording of a complete interrogation may be in a position to make a more precise judgment concerning the scope of the excluded statement than could be made if the judge needed to rely solely on testimony to piece together its contents. Specifically, the judge may be able to determine with some precision the point at which the defendant's statements ceased to be voluntary, and, consequently, render a more finely calibrated ruling regarding the admissibility of some of it.

Here, the introduction of the "now-or-never" theme linked to Novo's right to testify came more than ninety minutes into the interview.[7] Up to that point, Novo continued to deny culpability in Joshua's death, but did provide some information concerning his ostensible care of Joshua during the final day of his life and articulated the view that bruises on Joshua were the product of rough play. We conclude that until Serpa told Novo, "a jury's never going to hear a reason," Novo's statements were voluntary.

Because statements made by Novo before this point were voluntary, we must assess whether there is any other bar to their admissibility.

i. *Statements about Novo's Miranda rights.* As the motion judge correctly concluded, Serpa "misstated the defendant's Miranda rights when he said, 'if you decide to answer any questions now, with or without an attorney, you still have the right to stop the questioning at any time for the purpose of

---

[7]Before making his first statement about the jury, Serpa did state several times that the interview was Novo's "only opportunity" to help himself. In the context of the interrogation, this claim plainly indicated that this was Novo's only opportunity to justify his actions to police. Novo's right to testify was only implicated after Serpa first mentioned the jury.

consulting an attorney.' " "We do not require that the defendant be informed of his right to terminate questioning, a so-called 'fifth' Miranda warning." *Commonwealth* v. *Silanskas*, 433 Mass. 678, 688 n.11 (2001), citing *Commonwealth* v. *Smith*, 426 Mass. 76, 81 (1997). Nonetheless, the "details of the interrogation, including the recitation of Miranda warnings," are relevant in determining whether a confession is voluntary. *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). Put another way, although a police officer is not *required* to give the fifth Miranda warning, if the officer gives the warning and gets it wrong, the incorrect statement of rights may affect the voluntariness of the defendant's confession.

The Commonwealth contends that the advice as given was entirely correct. Novo could terminate questioning "for the purpose of consulting an attorney" — and he could also terminate questioning for any other purpose. While the Commonwealth may be right as a technical matter of grammar and syntax, an ordinary person who hears the statement, "you still have the right to stop the questioning at any time for the purpose of consulting an attorney" would not interpret it to mean that he can terminate questioning for any reason. Rather, the statement plainly implies that the *only* reason that a defendant may terminate questioning is to speak to an attorney.

Nevertheless, we conclude that the misstatement of Novo's fifth Miranda right likely had no effect on the voluntariness of his subsequent statement. The misstated warning came at the beginning of the interview, and Novo's demeanor as he mechanically acknowledged each warning indicates that he was fully aware of his Miranda rights from other encounters with the police and was not listening carefully to the language of the warnings. It is unlikely that the isolated misstatement materially affected his decision to speak to the officers.[8]

ii. *Failure to inform Novo of his right to use the telephone.*

---

[8]Serpa's misstatement of the so-called "fifth" Miranda right does not render Novo's waiver of his Miranda rights invalid, because "[w]e do not require that the defendant be informed of his right to terminate questioning, a so-called 'fifth' Miranda warning." *Commonwealth* v. *Silanskas*, 433 Mass. 678, 688 n.11 (2001), citing *Commonwealth* v. *Smith*, 426 Mass. 76, 81 (1997). As we have discussed, the misstatement is relevant only for its impact on the voluntariness of Novo's confession.

The motion judge concluded that the officers inadvertently failed to inform Novo of his right to use the telephone pursuant to G. L. c. 276, § 33A. That section provides:

"The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

As we have recently reaffirmed, § 33A only requires a police official to inform a person of the right to use the telephone after that person has been formally arrested. *Commonwealth* v. *Rivera*, 441 Mass. 358, 374 (2004). Here, Novo was not formally arrested until after the interview. There was no violation of § 33A that would affect the voluntariness or admissibility of Novo's statements.

In sum, the videotape clearly indicates that Novo heard and waived his Miranda rights, and that he made no attempt to assert his right to remain silent at any earlier point in the interview.[9] We therefore conclude that the portion of Novo's statement made prior to Serpa's introduction of the "now-or-never" theme was made voluntarily after a valid waiver of Novo's Miranda rights.[10] That portion of his statement should not have been suppressed.

3. *Conclusion.* Accordingly, the motion judge's order is modi-

---

[9]Several times after Serpa introduced the "now-or-never" theme, Novo asked the officers to arrest him. The motion judge concluded that, in the circumstances, "these statements did not constitute a proper exercise of the defendant's right to remain silent." We need not reach this issue, because all of Novo's requests to be arrested came *after* Serpa improperly introduced the "now-or-never" theme.

[10]Specifically, all of Novo's statements are admissible up through and including, "I did not touch that kid," approximately one hour and thirty-five minutes into his recorded interview. All of Novo's subsequent statements, which occur after Serpa's statement, "If you don't give us a reason, Roy, if you don't give us a reason right now why you did this, a jury's never going to hear a reason," should be suppressed.

fied to suppress only those statements made after Detective Serpa stated, "a jury's never going to hear a reason," and, as so modified, is affirmed.

*So ordered.*