NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10826


COMMONWEALTH  vs.  CHITEARA M. THOMAS.



Plymouth.     February 7, 2014. - September 2, 2014.

Present:  Ireland, C.J., Spina, Botsford, Gants, Duffly, & Lenk,
JJ.[1]



Homicide.  Burning a Dwelling House.  Attempt.  Constitutional
    Law, Assistance of counsel, Admissions and confessions,
    Voluntariness of statement, Harmless error, Self-
    incrimination.  Due Process of Law, Assistance of counsel.
    Evidence, Admissions and confessions, Voluntariness of
    statement.  Error, Harmless.  Practice, Criminal, Capital
    case, Motion to suppress, Assistance of counsel, Admissions
    and confessions, Voluntariness of statement, Harmless
    error.




    Indictments found and returned in the Superior Court
Department on September 22, 2006.

    A pretrial motion to suppress evidence was heard by Charles
J. Hely, J., and the cases were tried before Thomas A. Connors,
J.

    William S. Smith for the defendant.
    Mary E. Lee, Assistant District Attorney, for the
Commonwealth.

---

[1] Chief Justice Ireland participated in the deliberation on
this case prior to his retirement.

GANTS, J.  In the early morning of July 6, 2006, the defendant, Chiteara M. Thomas, used a cigarette lighter to set fire to a curtain in the first-floor apartment of a three-story house in Brockton (house).  The fire quickly spread from the first floor to the upstairs apartments.  Olinda Calderon, a resident in the third-floor apartment, died in the fire, and several residents and guests in the second- and third-floor apartments were injured.  A Superior Court jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation, arson of a dwelling house, and the attempted murder of thirteen persons.

On appeal, the defendant contends that the judge erred in denying, except in small part, her motion to suppress the statements she made to police on July 6 and 7, 2006,[2] and that a substantial likelihood of a miscarriage of justice arose from the admission in evidence of the defendant's invocation of her right to counsel at the commencement of her July 6 interview. We conclude that the judge erred in denying the motion to

---

[2] The judge allowed the motion to suppress only with respect to a four-minute segment of the interrogation on July 7, 2006, and denied the motion with respect to the remainder of the interrogation, which continued for over three hours over two days.  Because the defendant contended that it strengthened her claim that her subsequent confession on July 7 was not made voluntarily, the trial judge allowed the defendant's request that the jury hear the suppressed four-minute segment.

suppress the July 6 interview and that part of the July 7 interview that preceded the defendant's booking, but correctly denied the motion with respect to the defendant's postbooking confession.  We also conclude that the error was not harmless beyond a reasonable doubt with respect to the convictions of murder in the first degree and attempted murder, but was harmless beyond a reasonable doubt with respect to the conviction of arson of a dwelling house.  We therefore vacate the attempted murder convictions, affirm the conviction of arson of a dwelling house, and, with respect to the conviction of murder in the first degree, give the Commonwealth the option of either accepting a reduction of the verdict to felony-murder in the second degree or having the conviction vacated and proceeding with a new trial on the murder indictment.

Background.  Because the sufficiency of the evidence is not at issue, we summarize briefly the evidence at trial.  At the time of the fire, the defendant was a twenty-two year old homeless woman.  Michelle Johnson rented and resided in the first-floor apartment of the house, which was a "place to buy ['crack' cocaine]" and a known "drug house."  The defendant's boy friend, Cornelius Brown, and the defendant were among the persons allowed to stay in the apartment with Johnson, but before the fire, Johnson told the defendant to move out of the apartment.  The defendant was angry with Johnson for preventing

her from living with Brown, and repeatedly threatened to kill Johnson and burn the house down. The defendant returned to the house on multiple occasions and broke the windows of the first-floor apartment by throwing rocks and bricks at the house.

On June 27, 2006, a police officer saw the defendant walking on the porch of the house while holding a small paring knife. The police officer directed her to leave, but she continued to return. On July 3, police officers again saw her outside the house, where she had been arguing with Brown. A neighbor who lived across the street and witnessed the argument observed the defendant break one of the windows of the house and heard her yell, "I'll be back to torch the place," and, "If I'm not going to have a home, you're not going to have one." That day, Johnson threw a bottle at the defendant upon finding her sitting on the porch of the house, an act that enraged the defendant, especially when Brown failed to come to her defense. After that incident, the police warned the defendant not to return to the house, but she returned later that evening, and was arrested for trespassing. She was required to appear in court on July 5 to be arraigned on this charge, but defaulted, and a warrant issued for her arrest.

On the evening of July 5, the defendant visited the home of her friend, Veronica Copeland. The defendant was upset and high from smoking crack cocaine, drinking alcohol, and taking

Klonopin medication.  At or around midnight, the defendant drove Copeland's vehicle to the house without her permission, but Copeland followed her there and drove her back to Copeland's home.  At 12:30 A.M. on July 6, the defendant telephoned Johnson and told her that she hated her, that she thought Johnson was engaging in a sexual relationship with Brown, and that she was going to "mess [her] up."[3]  The defendant later took a bicycle from Copeland's home and rode back to the house.

Later that morning, the neighbor who lived across the street from the house was awakened by a traffic accident that occurred outside the house at approximately 4:50 A.M.  At daybreak, the neighbor saw the defendant approach the house on foot and reach her hand into the second window on the first floor of the left side of the house.  The neighbor then saw a reddish-orange glow from the first-floor windows, went outside, and saw the defendant running away from the house.[4]

The fire spread quickly through the three apartments.  All who were on the first floor escaped without injury, but the family on the second floor and their two guests were trapped by

---

[3] Michelle Johnson had earlier taunted the defendant by suggesting that Cornelius Brown was engaging in a sexual relationship with Johnson's friend.

[4] The police officer who responded to the traffic accident outside the house left the area between 5:20 A.M. and 5:30 A.M. The first report of the fire occurred at approximately 5:41 A.M.

the flames.  The adults threw the children out of a window into the waiting arms of a good Samaritan who stopped to provide assistance, and later jumped out of the window themselves, sustaining serious injuries when they hit the ground.  The four residents of the third-floor apartment also were trapped.  Three people, including a one month old baby girl, were rescued by fire fighters and survived; the fourth, Calderon, the mother of the baby, was pulled by a fire fighter from the bathroom where she had sought refuge but died at the hospital from smoke inhalation.

The police questioned the defendant on July 6 and 7, 2006, and arrested her during the interrogation on July 7.  The video recordings of these interviews were admitted in evidence and played in their entirety at trial.  On July 6 and initially on July 7, the defendant denied setting the fire, but after she was arrested and booked on the charges of murder and arson of a dwelling house, she admitted that she had "set the fire" with "just a lighter" by placing the flame on the curtain in "the second window."  The defendant said that she did not know why she did it, but that her "intentions were never to hurt anybody."  Her description of her conduct was consistent with the observations of the neighbor who had seen her reach her hand into a window of the house, and with the fire investigation, which determined that the cause of the fire was incendiary, that

the origin of the fire was the rear bedroom of the house, and that no accelerant had been used.

Discussion. 1. Motion to suppress. The defendant moved to suppress the statements she made on July 6 and 7, claiming violation of her right against self-incrimination and her right to counsel under the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. A judge in the Superior Court, who was not the trial judge, conducted an evidentiary hearing on the motion, and made the following relevant findings of fact, which we supplement where necessary with evidence in the record that is uncontroverted and that was implicitly credited by the motion judge, see Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008), and with the video recordings of the interviews of the defendant, which were admitted in evidence at the motion hearing.[5]

On the morning of July 6, the Brockton police department and the State police began investigating the fire as a possible arson. They soon learned that the defendant had been in a feud with a resident of the house. Brockton police Detective Michael

---

[5] Where a defendant's interview is video recorded, we are in the same position as the motion judge to determine what occurred during the interview and therefore independently make that determination. See Commonwealth v. Hoyt, 461 Mass. 143, 148-149 (2011).

Schaaf, who was assigned that day to "warrant apprehension," was asked to locate her. Detective Schaaf knew the defendant, and had arrested her for outstanding warrants on seven prior occasions.

The defendant knew she had an outstanding default warrant arising from her arrest for trespassing at the house on July 3, because she had failed to appear for her arraignment on July 5. She also believed that the police were looking for her as a suspect in connection with the fire that morning. Accompanied by Copeland, she went to the Brockton District Court to clear up her warrant and obtain an attorney. At approximately 12:50 P.M. on July 6, she was in the court house lobby near the Department of Probation office when Detective Schaaf approached her and told her that detectives wanted to speak with her at the police station about the fire. The defendant told him that she had an arrest warrant she was trying to clear up, and the detective replied that the police would "take care of" the warrant for her. The defendant agreed to go to the station with him. He did not place the defendant under arrest, handcuff her, or frisk her for weapons.

a. July 6 interview. The defendant was taken to an interview room at the police station, where she was met by State Trooper John Sylva and Brockton police Detective Dominic Persampieri at 1:53 P.M. The defendant agreed to have her

interview recorded, and a video recording was made of the interview.  Trooper Sylva read the Miranda warnings form to the defendant and showed her the printed warnings as he read them. After asking her if she understood these rights, the defendant replied, "I don't understand . . . .  If I said anything, 'okay, don't want to talk to you guys,' 'cause that wouldn't happen, right?"  Trooper Sylva replied, "Well, that's your right.  If you want to contact a lawyer, you can always have a lawyer present when you talk to us."  The defendant then asked, "And I'd have to sit here and wait for a lawyer, and probably be held and all that, right?"  Trooper Sylva said, "Well, I don't know. You do have . . . an outstanding warrant."  The defendant said, "That's what I mean."  Trooper Sylva replied, "[T]hat's a separate matter.  You were arrested because you had a warrant." The defendant told him that she had not been arrested, stating, "I didn't come here in cuffs."  She said, "Schaaf came to get me."

The following conversation then ensued:

Trooper Sylva:  "[B]efore we proceed any further, I just want you to decide whether you want to speak with us regarding an incident."

Defendant:  "I'd rather have a lawyer, because . . . I'm accused [of] starting a fire . . . [a] major fire."

Trooper Sylva:  "[W]e didn't bring anything up to you."

Defendant: "No, I'm bringing it up, 'cause I know what I'm here for. . . . And I know what I done, but . . . I'm not a fire-starter. I did not do that, man."

Trooper Sylva: "So what you're saying to me is that you do not want to . . . talk to us, is that correct?"

Defendant: "I want to talk, but I don't wanna talk unless I got somebody present who . . . ."

Detective Persampieri: "Do you want an attorney? Yes or no?"

Defendant: "Yes."

Detective Persampieri: "Okay. End . . . of conversation."

After this invocation of her right to an attorney, Detective Persampieri left the room, leaving the door open, and the defendant asked, "Am I being held, or do I have bail?" Trooper Sylva replied that that would be decided by the courts because the warrant had to be addressed.

Detective Persampieri then reentered the room. He stood at the table where the defendant was seated and, facing the camera, asked, "Is that off?"[6] He then looked down at the defendant and told her, "[U]nderstand one thing. Once you leave here, . . . [w]e're gonna do our investigation, and it's gonna get a lot hotter. . . . [W]hat we're trying to tell you, we're gonna give you the opportunity to tell us your side of the story. Okay?" The defendant said, "[T]hat's why I wanted to stay here," but,

---

[6] The video recording was not off and recorded all that transpired thereafter.

before leaving the room again, the detective interrupted her and said, "Sorry.  You already lawyered up."

The defendant remained seated at the table and stated, "I'm real confused here."  Brockton police Detective Jackie Congdon, who was nearby but off camera, asked her why she was confused. The defendant became visibly upset and said that she had never been in this position before, where she was being accused of starting a fire.  The detective asked, "If you're not an arsonist, then you'd have no problem with us taking that shirt from you?"  The defendant became visibly upset and said that she had no problem with giving her shirt to the police, adding, "You can have anything.  You can touch anything on me."  Detective Congdon then said, "You had your chance, you just lawyered up." The conversation continued as follows:

> Defendant:  "But I didn't . . . well, but I don't . . . I, I mean that if I could go back so there's no way I can say no at all?  There's no way I can say, 'Yeah, I'm gonna give my story?' '[C]ause I'm confused."
>
> Detective Congdon:  "Is that what you want to do?"
>
> Defendant:  "I want to tell my story, but I'm not sure, do you understand what I'm trying to say . . . .  I've never been in this position."
>
> Detective Congdon:  "Well, we can't talk."
>
> Defendant:  "So I don't know if I need lawyer help or not. And now that he . . . what did he, he just said now, I have my chance to tell my story.  I, I would rather do it like that."

>   Detective Congdon:  "That's what we're asking. . . So you want to give up your right to have a lawyer?"
>
>   Defendant:  Yes.  'Cause I don't know what . . . .  All this confusion . . . .  I'm confused."

Detective Congdon asked if the defendant would rather have her (Detective Congdon) in the interview, and the defendant said she would.  Off camera, Detective Congdon then told Trooper Sylva and Detective Persampieri that the defendant wanted to talk with her.  Detective Persampieri asked, "She just wants you?" referring to Detective Congdon.  The defendant stated, "I just said I would feel comfortable with her being around," and added, "When you said I had my chance, though, when you said that I had my . . . ."  Detective Persampieri interrupted her and asked, "Do you want to talk with us?"  She answered, "Yes."

Trooper Sylva and Detective Persampieri then returned to the room, and Detective Congdon told the defendant that she would be outside the room if the defendant needed anything.  Trooper Sylva again read her the Miranda rights, and the defendant signed the waiver form.  In the ensuing conversation, the defendant denied setting the fire, but made many incriminating admissions regarding her whereabouts in the hours before and immediately after the fire, the details of her feud with Johnson (including her admission that she smashed the windows of the house), the intensity of her animosity toward Johnson, her tumultuous romantic relationship with Brown and her

jealousy regarding his purported sexual infidelity, and her disappointment that he had not sided with her in the feud with Johnson.

The interview continued until 4:40 P.M. When the interview ended, Trooper Sylva stated, "We gotta put you through the system." The defendant asked, "I should be able to go right back to the court house right now, right?" Trooper Sylva told her the court house was closing, and he did not know if there was time to get her back there. The defendant was held in custody at the police station overnight on the default warrant for the July 3 trespass charge, and was not brought to court until the next morning, at which time she was released on personal recognizance.

We review de novo any findings of the motion judge that were based entirely on the documentary evidence, i.e., the recorded interviews of the defendant. See note 5, supra. We accept other findings that were based on testimony at the evidentiary hearing and do not disturb them where they are not clearly erroneous. See Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011). However, we "make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found." Id.

The defendant clearly and unequivocally invoked her right to counsel at the beginning of the interview, when she declared

that she did not want to answer questions without an attorney present.  The United States Supreme Court explained in Edwards v. Arizona, 451 U.S. 477, 481-482 (1981):

> "In Miranda v. Arizona, the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney.  [384 U.S. 436, 479 (1966)].  The Court also indicated the procedures to be followed subsequent to the warnings.  If the accused indicates that he wishes to remain silent, 'the interrogation must cease.' If he requests counsel, 'the interrogation must cease until an attorney is present.'  Id. at 474."

The Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  Edwards, supra at 484.  "[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-485.

The motion judge concluded that the prohibition in Edwards did not apply because the defendant was not in custody when she

invoked her right to counsel.[7]  We disagree.  "In assessing whether a defendant was in 'custody' for purposes of the Miranda requirements, '[t]he crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody. . . . Thus, if the defendant reasonably believed that he was not free to leave, the interrogation occurred while the defendant was in custody, and Miranda warnings were required.'"  Commonwealth v. Hilton, 443 Mass. 597, 609 (2005), S.C., 450 Mass. 173 (2007), quoting Commonwealth v. Damiano, 422 Mass. 10, 13 (1996).  See Commonwealth v. Kirwan, 448 Mass. 304, 309 (2007) ("The test is an objective one:  would a reasonable person in the circumstances of the defendant's interrogation have perceived the environment as coercive?").

When the defendant was taken from the court house to the police station for questioning, the defendant knew that a default warrant had issued for her arrest because she had failed to appear at her arraignment.  She informed Detective Schaaf that she was trying to address the outstanding warrant.  A

___

[7] The motion judge found that custody commenced after State police Trooper John Sylva and Brockton police Detective Dominic Persampieri resumed their interrogation following the defendant's conversation with Brockton police Detective Congdon.[8] Although Brockton police Detective Michael Schaaf had told the defendant that the police would "take care of" the warrant for her, there was no evidence that the police had taken any action regarding the warrant, or had told the defendant that they had.

reasonable person in that position would recognize that, when there is an outstanding warrant for a person's arrest, and when the person named in the warrant is at a police station in the company of detectives who know there is such a warrant, that person is not free to leave until she is brought before a judicial officer and released on bail or personal recognizance. The motion judge found that the defendant was not in custody until Trooper Sylva told her after she invoked her right to counsel that her warrant had to be addressed.  But we conclude that a reasonable person in that position would have known that the warrant had to be addressed without being told so by a police officer, and would also have known that she could not be released until it had.  Although the determination of custody rests on what a reasonable person in that position would believe, rather than on the subjective understanding of the interrogating police officer or the person being questioned, see Kirwan, 448 Mass. at 309, it is noteworthy that the police officers who were questioning the defendant and the defendant herself understood that she was not free to leave until the warrant had been addressed.[8]

---

[8] Although Brockton police Detective Michael Schaaf had told the defendant that the police would "take care of" the warrant for her, there was no evidence that the police had taken any action regarding the warrant, or had told the defendant that they had.

The motion judge appears to have rested his finding that the defendant was not in custody in large part on her insistence that she had not been arrested by Detective Schaaf and her statement, "I didn't come here in cuffs." However, this does not suggest that she believed (or, more importantly, that a reasonable person in her position would believe) that she was free to leave or that the police would not arrest her if she attempted to leave. Nor does it suggest that she went to the police station voluntarily. In fact, when Trooper Sylva asked her, "You came voluntarily?" she replied, "No, Schaaf came to get me."[9]

The motion judge also found that, "[e]ven if the defendant was in custody at the time she asked to speak with a lawyer, the Edwards rule was not violated," because "[t]he defendant initiated her conversation with Detective Congdon after the other detectives had terminated the interview and left the

_____

[9] The motion judge correctly rejected the Commonwealth's argument that, even if the defendant was in custody because of the outstanding arrest warrant, she was not in custody because of the arson investigation and therefore was not in custody for purposes of applying the rule of Edwards v. Arizona, 451 U.S. 477, 484-485 (1981). The judge noted that the "exception to the usual Miranda custody principles is limited to the questioning of a prisoner who is already in the 'confines of ordinary prison life,'" quoting Commonwealth v. Larkin, 429 Mass. 426, 434-435 (1999). See id. at 435, quoting People v. Margolies, 125 Misc. 2d 1033, 1041 (N.Y. Sup. Ct. 1984) ("The precise question is thus 'whether the prisoner would reasonably believe himself to be in custody beyond that imposed by the confines of ordinary prison life'").

room."  While it is true that the defendant initiated a conversation with Detective Congdon by saying, "I'm real confused here," it is also true that the defendant stated her confusion only after Detective Persampieri told her, "Once you leave here, . . . [w]e're gonna do our investigation, and it's gonna get a lot hotter. . . .  [W]e're 'gonna give you the opportunity to tell us your side of the story," but, "Sorry. You . . . lawyered up."

Detective Persampieri's statements were improper for two reasons.[10]  First, they were an attempt to persuade her to change her mind about her decision to invoke her right to counsel seconds after she had made that invocation.  The invocation of the right to counsel, like the invocation of the right to silence, is part of the "right to cut off questioning" that must be "scrupulously honored" by law enforcement.  Michigan v. Mosley, 423 U.S. 96, 103-104 (1975), quoting Miranda, 384 U.S. at 474, 479.  The police may not fail to honor the right of a person in custody to cut off questioning "by persisting in repeated efforts to wear down his resistance and make him change his mind."  Mosley, supra at 102, 105-106.  See Commonwealth v. Brum, 438 Mass. 103, 112 (2002).  Cf. Commonwealth v. Clarke,

---

[10] Detective Persampieri's query whether the video recording was "off" suggests that he recognized the impropriety of what he was about to say.

461 Mass. 336, 352 (2012), quoting Connecticut v. Barrett, 479 U.S. 523, 534 n.5 (1987) (Brennan, J., concurring in the judgment) ("where the initial request to invoke the right to remain silent is clear . . . , 'the police may not create ambiguity in a defendant's desire by continuing to question him or her about it'").

Second, Detective Persampieri's failure scrupulously to honor the defendant's invocation of her right to counsel was aggravated by his statements suggesting that, by invoking her right to counsel and thereby ending the interview, she was losing her opportunity to tell her side of the story.  In Commonwealth v. Novo, 442 Mass. 262, 267 (2004), we criticized an interrogation technique in which the police told the defendant that this would be his "only opportunity" to offer an explanation as to why he hit the victim.  In Novo, the police persisted in "this now-or-never theme," and went on to tell the defendant that, if he did not give them a reason for his conduct, "a jury [were] never going to hear a reason."  Id. at 267, 268.  We concluded that this misrepresentation of the defendant's right to testify at trial was an "egregious intrusion on rights that art. 12 declares to be fundamental." Id. at 268-269.  See Commonwealth v. Ortiz, 84 Mass. App. Ct. 258, 268 (2013) ("detectives' message that this was the defendant's 'last chance' to tell his story was a plain

misstatement of the defendant's rights to present a defense").
Here, the detective did not expressly tell the defendant that,
by having "lawyered up," she was losing her chance to tell her
story to the jury. But we conclude that the message he
implicitly communicated to her was unfair and misleading even if
she understood him to mean that she was losing her chance to
tell her story to law enforcement officers. We recognize that
we stated in Novo, supra at 269 n.5, that the "officers in
[that] case might have properly (and truthfully) told [the
defendant], 'This is your only chance to talk to us,' or, 'This
is your only opportunity to tell your story to us so that we can
help you.'" On further reflection, we declare now that these
statements, too, are neither proper nor truthful, especially
where a suspect has invoked her right to counsel. There is
nothing that would bar a suspect, after consulting with counsel,
from deciding to speak with the police, and there is no sound
reason why the police would refuse such a request.

Detective Congdon's conversation with the defendant added
to the defendant's confusion that Detective Persampieri's words
had elicited. After the defendant told her she did not start
fires and agreed to the detective's request to hand over her
shirt, Detective Congdon said, "You had your chance, you just
lawyered up," reiterating Detective Persampieri's warning that
she had lost her "chance" to explain what happened by invoking

her right to counsel.  The potency of Detective Persampieri's improper persuasion was apparent from the words the defendant spoke as she decided whether to revisit her invocation of counsel:  "I want to tell my story," but "I don't know if I need lawyer help or not," and "he just said now, "I have my chance to tell my story," so "I would rather do it like that."  In other words, she reasoned that she knew she wanted to tell her story but she was not sure whether she needed the assistance of a lawyer, so she decided to tell her story without counsel lest she lose her opportunity to do so.  Contrast Commonwealth v. Chipman, 418 Mass. 262, 273 (1994) (police did not engage in "any type of prodding designed to elicit inculpatory statements").

"When a defendant invokes his right to counsel, all subsequent statements are inadmissible unless counsel is provided or the Commonwealth can prove beyond a reasonable doubt that the defendant "initiate[d] further communication, exchanges, or conversations with the police. . . and thereby waived his right to counsel." Commonwealth v. Hoyt, 461 Mass. 143, 151 (2011), quoting Edwards, 451 U.S. at 485.  Where, as here, the defendant's initiation of conversation with a detective was triggered by another detective's attempt to persuade her that she was making a mistake by "lawyer[ing] up," and that, by doing so, she was losing her chance to tell her

version of what happened, the Commonwealth cannot meet its burden of proving beyond a reasonable doubt that the defendant waived her right to counsel. Because the police officers here did not scrupulously honor the defendant's right to cut off questioning until she had the benefit of counsel, and instead sought to persuade her to change her mind by suggesting that "lawyering up" was costing her the opportunity to tell her side of the story, we conclude that the continuation of the questioning on July 6 violated the Edwards rule and that the statements the defendant made that day in response to that questioning should have been suppressed. See Hoyt, supra.

b. July 7 interviews. The motion judge found that, at the arraignment on the trespass charge on the morning of July 7, counsel was appointed for the defendant on that charge and she was released on personal recognizance.[11] That day, the police learned that Calderon had died from her injuries in the fire and that a neighbor had identified the defendant as the person the neighbor saw putting a hand into a broken window at the house. Detective Schaaf was again directed to find the defendant, and he located her in Brockton at approximately 3 P.M. He told the defendant that the police wanted to speak with her again at the station. The defendant was "a little upset" and "annoyed" about

---

[11] The record is silent as to whether she conferred with appointed counsel.

returning to the station, but she was "compliant" and allowed Detective Schaaf to drive her there. The defendant waited nearly three hours at the station with officers by her side before she was interviewed again by Trooper Sylva and Detective Persampieri at approximately 6 P.M. There, she was again given the Miranda warnings and again waived her rights.

Trooper Sylva told the defendant that "[s]omebody died in that fire" and that they had "eyewitness accounts of what happened." He told her about "mitigating circumstances," and urged her to present her side of the story. When Detective Persampieri asked her to tell them what happened, she said she had already told them what happened, and stated, "I'm not changing nothing." When asked by Trooper Sylva, "You're going stick with the same story you told us yesterday . . . ?" she answered, "Yeah." In the approximately thirty minutes before she was arrested and booked on the charges of murder and arson of a dwelling house, she did not change her story and continued to deny setting the fire.[12]

---

[12] Shortly after the defendant was told she was under arrest for murder and arson of a dwelling house, the defendant got onto the floor and began praying, temporarily stopping the interrogation. The motion judge suppressed this four-minute segment, finding that the defendant's statements during this highly emotional period were not made voluntarily. The defendant later regained her composure, and the interrogation continued for a few minutes before she was escorted out of the room for booking.

State police Trooper Scott McGrath was present with the defendant during part of the booking procedure.  While the defendant was being booked, she turned to the trooper and told him, "I'm not a bad person."  The judge found that this was a spontaneous statement by the defendant.  The trooper replied that he did not think she was a bad person, and told her that, if she wanted to return upstairs and speak with Trooper Sylva and Detective Persampieri, she could.  He asked her if she wanted to explain to them what happened, and the defendant said, "I do want to speak with them again."

At 6:49 P.M., the defendant returned to the interview room and met again with Trooper Sylva and Detective Persampieri.  After she again was read her Miranda rights and waived them, Trooper Sylva asked, "Let's hear the real story.  What happened?"  The defendant then admitted that she set the fire at the house.  She explained that she set fire to a curtain in the window on the left side of the house, using "[j]ust a lighter" and then went to a friend's house to tell her the house was burning.  She said she had no "intentions of it getting that big," and that she never meant to hurt anybody.

The motion judge found that the entirety of the July 7 interview was custodial, and that the defendant made a knowing, intelligent, and voluntary waiver of her Miranda rights.  He also found that, apart from the four-minute segment of the

interview during which she was praying, her statements were voluntary beyond a reasonable doubt. The motion judge also found that, even if there had been an Edwards violation in the July 6 interview, there was no such violation in the July 7 interview. To reach this conclusion, the motion judge determined, first, that the Edwards rule did not bar the police from initiating the July 7 interview, and, second, that any Edwards violation on July 6 did not taint any part of the July 7 interview. We review each of these determinations and, for reasons we shall articulate, conclude that, because the defendant had been appointed counsel during her arraignment on the trespass charge on the morning of July 7 and had had the opportunity to confer with counsel, the police were not barred from subsequently initiating another interview of her after her release from custody, but only her July 7 postbooking confession was free from taint arising from the Edwards violation on July 6.

As to the first determination, the judge noted that, after a defendant invokes her right to counsel, the Edwards rule requires suppression of a subsequent, police-initiated statement only where the defendant was in continuous custody from the time of the invocation to the time of the police initiation of interrogation. See Commonwealth v. Galford, 413 Mass. 364, 370-371 (1992), cert. denied, 506 U.S. 1065 (1993) (under Federal

law, "where there is a break in custody, <u>Edwards</u> does not require that a subsequent statement be excluded," because "[w]hen a defendant is released from custody, the coercive effect of custody disappears"). The motion judge determined that the <u>Edwards</u> rule did not apply because there was a break in the defendant's custody between her release by the District Court on the morning of July 7 and her return to the police station with Detective Schaaf later that day at approximately 3 <u>P</u>.<u>M</u>. We agree with the motion judge that, because of the break in custody, the defendant's invocation of her right to counsel did not bar the police under Federal law from initiating questioning of her after her release on July 7. See <u>Galford</u>, <u>supra</u>.

In <u>Galford</u>, however, we noted that the defendant's arguments were based on his rights pursuant to the Fifth and Fourteenth Amendments, and we therefore did not address whether, under State constitutional law, the police may initiate questioning of a suspect once the suspect is released from custody where that suspect earlier had invoked her right to counsel. <u>Id</u>. at 369 n.7. We address that issue here.[13] We need

---

[13] In this case, the defendant claimed a violation of her right to counsel under art. 12 of the Massachusetts Declaration of Rights, but even if she had not, we properly consider the question under our State constitutional law because in an appeal from a conviction of murder in the first degree, pursuant to our

not decide here whether to adopt under our State constitutional law the Federal rule regarding break in custody; we need only decide whether to adopt it in the rather unusual circumstances presented in this case, especially where this issue was not briefed by the parties.

Here, the defendant went to court on July 6, not only to clear up her warrant, but to have an attorney appointed at the arraignment to represent her. We infer that she wished to have the advice of counsel because she recognized that she was suspected of having set the fire at the house earlier that morning. Her invocation of the right to counsel at the beginning of her interview on July 6 supports that inference. On the morning of July 7, the defendant appeared in court and had counsel appointed to represent her in a case alleging trespass of the same house that she was suspected of having burned. Although the record does not shed light on whether she actually conferred with appointed counsel, she had the opportunity to do so that morning. In these circumstances, where the defendant invoked her right to counsel, counsel was appointed to represent her in a related case the next day, and interrogation resumed several hours thereafter, following her

statutory duty under G. L. c. 278, § 33E, we review all potential claims to determine whether there was a substantial likelihood of a miscarriage of justice. See Commonwealth v. Randolph, 438 Mass. 290, 294 (2002).

release from custody, we conclude that the reinitiation of custodial interrogation, standing alone, did not violate art. 12. We leave for another day whether police reinitiation of questioning following a defendant's release from custody might violate art. 12 where the defendant had earlier invoked her right to counsel and had not had the opportunity to confer with counsel appointed for her in a related case.

The second determination, as the judge correctly noted, addresses whether any Edwards violation on July 6 tainted the statements made on July 7. An Edwards violation is also a Miranda violation. See Edwards, 451 U.S. at 482 ("Miranda . . . declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation"). In contrast with Federal constitutional law, under our State constitutional law, we "presume that a statement made following the violation of a suspect's Miranda rights is tainted," and require the prosecution to "show more than the belated administration of Miranda warnings in order to dispel that taint." Commonwealth v. Smith, 412 Mass. 823, 836 (1992). A statement obtained in violation of Edwards, and thus also in violation of Miranda, is "by definition 'coerced.'" Smith, supra, quoting State v. Lavaris, 99 Wash. 2d 851, 857 (1983). The presumption of taint under our State constitutional law arises from the recognition that, where the police procure a

statement from a suspect in violation of Miranda, a subsequent statement may be the product of the initial coercion even where the suspect knowingly and voluntarily waives her right to silence and to counsel, if the custodial interrogation was essentially continuous or if the suspect believes that it would be futile to invoke her rights because she incriminated herself in the first statement.  See Hoyt, 461 Mass. at 153; Commonwealth v. Prater, 420 Mass. 569, 581, 583-584 (1995).  "This presumption may be overcome by showing that either:  (1) after the illegally obtained statement, there was a break in the stream of events that sufficiently insulated the post-Miranda statement from the tainted one; or (2) the illegally obtained statement did not incriminate the defendant, or, as it is more colloquially put, the cat was not out of the bag."  Prater, supra at 580, quoting Commonwealth v. Osachuk, 418 Mass. 229, 235 (1994).  "[W]hether one or both lines of analysis is required before a confession is admitted turns on the facts of the case."  Commonwealth v. Torres, 424 Mass. 792, 799-800 (1997), quoting Prater, supra at 580 n.10.

     The motion judge found that, where over twenty-two hours had elapsed between the end of the interview on July 6 and the beginning of the interview the next day, and where the defendant had been released from custody during that time period, there was a "significant break in the stream of events" between the

July 6 and July 7 statements that "weigh[ed] in favor of the voluntariness of the defendant's Miranda waivers and statements on July 7." The motion judge also found that the incriminating July 6 admissions "did not cause the defendant to feel a sense of futility that would pressure her into making admissions on July 7."

We agree with the judge's finding of a material break in time, but we conclude that, in the circumstances of this case, the taint from the Edwards violation was not dispelled in the interrogation that occurred on July 7 before the defendant's booking, where she essentially related the same story she told on July 6. As to this part of the interrogation, the invocation of rights would have appeared futile to the defendant because she intended to tell the officers only what she had told them the previous day, and that proverbial cat was already out of the bag. See Commonwealth v. Mahnke, 368 Mass. 662, 686 (1975), cert. denied, 425 U.S. 959 (1976) ("The cat-out-of-the-bag line of analysis requires the exclusion of a statement if, in giving the statement, the defendant was motivated by the belief that, after a prior coerced statement, his effort to withhold further information would be futile and he had nothing to lose by repetition or amplification of the earlier statements. Such a statement would be inadmissible as the direct product of the earlier coerced statement"). However, the cat was not out of

the bag when she returned to the interview room after her booking with the intent to reveal that she had set the fire. See Commonwealth v. Watkins, 375 Mass. 472, 478, 482 (1978) (cat was not out of bag where defendant only admitted in initial suppressed statement that he had been in Boston with another suspect but, after being allowed to use telephone to call attorney, admitted in subsequent statement to his involvement in murder).  Concerning this part of the interrogation, we credit the motion judge's finding that the defendant's Miranda waiver was voluntary and was not tainted by the July 6 violations of Miranda and Edwards.  Therefore, we conclude that the statements made by the defendant during the prebooking interview of July 7 should have been suppressed, but that the statements she made during the postbooking interview were properly admitted in evidence.

2.  Harmless error analysis.  Having determined that all but the postbooking interview should have been suppressed, we turn to whether the erroneous admission of these statements was harmless beyond a reasonable doubt.  See Commonwealth v. Santos, 463 Mass. 273, 287 (2012).  In making this determination, "we consider 'the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was

merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt.'" Id., quoting Commonwealth v. Dagraca, 447 Mass. 546, 553 (2006).

Essential to the jury's verdict was determining whether (1) the defendant intentionally set the fire; (2) the setting of the fire caused the death of Calderon; and (3) the defendant intended by setting the fire to kill Johnson.[14] The jury, through their guilty verdicts, necessarily concluded beyond a reasonable doubt that the defendant intentionally set the fire and that the fire caused Calderon's death. In view of the evidence at trial, especially the defendant's confession to setting the fire during the postbooking interview, which was consistent with the neighbor's observations of the defendant moments before the house went up in flames and the fire investigator's opinion regarding the cause and origin of the fire, the erroneous admission of the defendant's July 6 and July 7 prebooking statements could not reasonably have affected these two conclusions. These findings alone (along with the undisputed fact that the house was a dwelling) were sufficient to support a guilty verdict of arson of a dwelling house and,

---

[14] We do not suggest that the jury were asked these three questions, only that they effectively had to answer them to reach their verdicts.

with respect to the indictment charging murder, of the lesser
crime of felony-murder in the second degree, with arson of a
dwelling house as the predicate felony.[15,16]  The erroneous
admission of the statements, therefore, was harmless as to these
convictions.

We are not persuaded, however, that the erroneous admission
of the statements was harmless beyond a reasonable doubt as to
the third question:  whether the defendant intended to kill

---

[15] The elements of felony-murder in the second degree are as
follows:

> "1. The defendant committed or attempted to commit a
> felony with a maximum sentence of less than imprisonment
> for life.

> "2. The death occurred during the commission or
> attempted commission of the underlying felony.

> "3. The underlying felony was inherently dangerous
> (or) the defendant acted with a conscious disregard for the
> risk to human life."

Model Instructions on Homicide 60 (2013).  As the judge here
explained to the jury, arson of a dwelling house is an
inherently dangerous felony.  Commonwealth v. Bell, 460 Mass.
294, 308 (2011).

[16] Because the jury found the defendant guilty of murder in
the first degree on a theory of deliberate premeditation, the
jury, in accordance with the judge's instructions, did not reach
a verdict as to felony-murder, which would have been murder in
the second degree because the predicate felony, arson of a
dwelling house, in violation of G. L. c. 266, § 1, is not a life
felony.  However, there can be no doubt that the jury found the
defendant guilty of this offense because they found her guilty
on the indictment charging arson of a dwelling house and
necessarily found that the death arose from the commission of
the arson.

Johnson. The jury's finding that the defendant intended to kill Johnson was necessary to its guilty finding of murder on the theory of deliberate premeditation[17] and its guilty findings on the thirteen indictments charging attempted murder, all of which rested on a finding of a transferred intent to kill. There was sufficient evidence, apart from the erroneously admitted statements of the defendant, to permit a reasonable jury to make this finding, based largely on the defendant's earlier threats to kill Johnson and the persistent feud between them. But the evidence supporting a finding of an intent to kill was not overwhelming, and the defendant's manner of setting the fire (using a cigarette lighter to set fire to the curtain in one window of the house, without adding any accelerant and without making any apparent effort to block egress from the first-floor apartment) was not reasonably likely to result in Johnson's death. In these circumstances, we cannot conclude with the required confidence that admission of the defendant's statements, made over the course of more than three hours of interrogation, where she spoke of her hatred of Johnson, her breaking of the windows in the house, her anger at Johnson for taunting her with Brown's supposed sexual infidelity, and her

---

[17] The judge instructed the jury on the elements of murder in the first degree on the theory of extreme atrocity or cruelty, but the jury did not find the defendant guilty on this theory.

failure to use her cellular telephone to call 911 for assistance even after she heard the screams of those trapped by the fire, was harmless to the jury's finding that the defendant intended to kill Johnson, and therefore harmless to their guilty verdicts on the indictments charging murder and attempted murder. Contrast Commonwealth v. Contos, 435 Mass. 19, 27-32 (2001).

Conclusion. The convictions of murder in the first degree and of attempted murder cannot stand for the reasons we have explained. We vacate the attempted murder convictions and remand them for a new trial. We affirm the verdict of arson of a dwelling house. Because the jury necessarily found the required elements of felony-murder in the second degree, based on their verdicts of murder and of arson of a dwelling house, and because the erroneous admission of the defendant's statements was harmless beyond a reasonable doubt as to these required elements, the Commonwealth shall have the option of either having the conviction of murder in the first degree vacated and proceeding with a new trial on the murder indictment, or accepting a reduction of the verdict to felony-murder in the second degree.[18] Within fourteen days of the

---

[18] We have considered and rejected the defendant's argument that the admission of that part of the July 6 recording where the police officers chastised the defendant for having "lawyered up," and the prosecutor's reference to this characterization in closing argument, created a substantial likelihood of a

issuance of this opinion, the Commonwealth shall inform this court whether it will move to have the defendant sentenced on the lesser offense of felony-murder in the second degree or whether it will retry the defendant for murder in the first degree.  See Commonwealth v. Rutkowski, 459 Mass. 794, 800 (2011), and cases cited.  We will issue an appropriate rescript to the Superior Court after the Commonwealth informs us of its decision.  If the Commonwealth opts to move for sentencing on the lesser offense of felony-murder in the second degree, the conviction of arson of a dwelling house would of course have to be dismissed as duplicative.  See Commonwealth v. Gunter, 427 Mass. 259, 275-276 (1998), S.C., 459 Mass. 480, cert. denied, 132 S. Ct. 218 (2011).

So ordered.

---

miscarriage of justice.  The defendant chose to admit the entirety of the video recordings in the hope of persuading the jury that her statements were not made voluntarily, and therefore should not have been considered by them.  This strategy may have been unwise in retrospect, but it was not "manifestly unreasonable when made."  Commonwealth v. Housen, 458 Mass. 702, 711 (2011).  Nor was it an error "likely to have influenced the jury's conclusion."  Commonwealth v. Wright, 411 Mass. 678, 682 & n.1 (1992).  Viewing the references to the defendant having "lawyered up" in the context of the totality of the evidence, we conclude that it did not create a substantial likelihood of a miscarriage of justice as to any of the verdicts that we affirm in this opinion.